Argued June 8, reargued October 11, affirmed October 28, 1921.

GRANT *v.* STATE INDUSTRIAL ACCIDENT COMMISSION.

(201 Pac. 438.)

**Master and Servant—Notice of Final Action on Compensation Claim Held Given for Purpose of Appeal.**

1. Within Section 6637, Or. L., providing that any beneficiary not satisfied with the decision of the Industrial Accident Commission may within 30 days after "notice" of the "final action" of the commission appeal to the Circuit Court, *held* that, though the question of compensation for temporary total disability was closed on the injured employee returning to work, yet the commission having thereafter continued to exercise jurisdiction, and treated as open the question of permanent partial disability because of a floating cartilage of the knee-joint, its subsequent determination that nothing should be awarded on that account unless he submitted to operation, and letter to his attorneys to that effect, was final action

and notice thereof, as regards time to appeal on that branch of the case.

**Master and Servant—Compensation Claimant's Duty to Submit to "Reasonably Essential" Operation Defined.**

2.   In Section 6633, Or. L., providing that, if a workman entitled to compensation under the act refuses to submit to such surgical treatment as the commission deems "reasonably essential" to promote recovery his right to compensation shall be suspended, the words "reasonably essential" are used in a relative sense, and imply the necessity of considering not merely the opinions of medical men, though all of them agree, but all the facts before attempting to decide; and right to compensation is suspended only if the workman refuses to submit to an operation to which an ordinarily reasonable man would submit if similarly situated.

**Master and Servant—Reasonableness of Compensation Claimant's Refusal to Submit to Operation Jury Question.**

3.   Whether the conduct of a workman in refusing to submit to a surgical operation directed under Section 6633, Or. L., is unreasonable, and so suspends his right to compensation, is one of fact for the jury demanded on appeal under Section 6637, and not of law for the court, where either the facts are in dispute, or where, they being admitted, reasonable men would draw different inferences therefrom.

**Master and Servant—Reasonableness of Compensation Claimant's Refusal to Submit to Operation Held Question for Jury.**

4.   Whether a workman, in refusing to submit to an operation for a floating cartilage of the knee-joint, acted reasonably, so that his right to compensation was not suspended thereby, *held*, in view of the risk of a stiff knee, one of fact for the jury, though the medical men agreed that an operation was advisable.

**Master and Servant—Jury's Decision on Appeal in Compensation Case Conclusive.**

5.   Where the reasonableness of a compensation claimant's refusal to submit to an operation directed under Section 6633, Or. L., is a question of fact for the jury demanded under Section 6637, on appeal from the Industrial Accident Commission to the Circuit Court, the court is bound by the jury's decision, though the verdict does not follow the exact language of the statute.

**Master and Servant — Percentage of Disability of Compensation Claimant Held for Jury.**

6.   The question of percentage of disability of an injured workman because of a floating cartilage of the knee-joint *held*, in view of the conflicting testimony, one for the jury, on appeal from commission.

---

2.   On refusal of injured workman to have operation performed as bar to compensation under Workmen's Compensation Act, see notes in Ann. Cas. 1915D, 482; L. R. A. 1916A, 387.

On duty of injured employee to submit to operation or to take other measures to restore earning capacity, see note in 6 A. L. R. 1260.

From Multnomah; W. N. GATENS, Judge.

In Banc.

The State Industrial Accident Commission refused to make an award to C. Grant for an alleged permanent partial disability and he appealed to the Circuit Court; not being satisfied with the result of the trial in the Circuit Court, the commission appealed to this court.                                    AFFIRMED.

For appellant there was a brief over the name of *Mr. I. H. Van Winkle,* Attorney General, with an oral argument by *Mr. J. A. Benjamin,* Assistant Attorney General.

For respondent there was a brief over the names of *Mr. Walter T. McGuirk, Mr. W. H. Bard* and *Mr. G. C. Schneider,* with oral arguments by *Mr. McGuirk* and *Mr. Bard.*

HARRIS, J.—The questions presented are: (1) Was the appeal to the Circuit Court taken within time? And (2): Is Grant entitled to compensation for permanent partial disability notwithstanding his refusal to submit to an operation?

It is necessary first to give a history of the case. Grant was employed by the Columbia Shipbuilding Corporation as a riveter and as such employee was subject to the Workmen's Compensation Law. While Grant was at work on September 23, 1919, a plank gave away causing his left knee to strike against a piece of steel, thus producing what was finally determined to be a floating semi-lunar cartilage of the knee-joint. On October 4, 1919, Grant returned to work. On October 23d Grant filed with the Industrial Accident

Commission a formal claim for compensation, and the commission promptly and without delay allowed $18.17 as compensation for temporary total disability for the nine working days between September 23d and October 4th.

Ordinarily the commission permits the injured workman to choose his own doctor; and such was the course pursued in this case. Grant was first treated by Dr. Besson. On October 29th, L. J. Moore, an examiner for the commission, reported to the commission that Grant had called upon him and stated:

"That his knee-cap was still giving him trouble and thought that he would have to lay off again. Dr. Besson some time ago told him he might have to operate if the knee caused any more trouble, but as the doctor had been out of town for the last week or more, * * I advised Mr. Grant that he was free to go to some other doctor if he wished."

Acting upon the permission given by the examiner, Grant consulted Dr. S. H. Sheldon. Grant was obliged again to quit work on October 27th. Under date of October 29th Dr. Sheldon reported to the commission that Grant had been sent to him for treatment and that in his opinion—

"the lateral capsule of left knee is torn and advised that the knee be put in plaster case for at least two weeks, which has been done."

On December 9th the examiner reported to the commission that Grant had returned to work December 5, 1919,—

"at a job where he is able to sit down, and wishes compensation from November 11th to December 5th be put through as promptly as possible";

and under date of December 13, 1919, the examiner wrote to the commission stating that:

"Dr. Sheldon called up yesterday and reported that Mr. Grant was able and did return to work December 5th, but that he is still under his surveillance and care for the loose cartilage of his knee."

In the record made by the commission is a copy of "findings and final action" by the commission showing that on December 15, 1919, the commission found that Grant was disabled one month and fifteen days, "is entitled to payment" of $82.79 for temporary disability, of which sum $42.40 has been paid, and "is now entitled to receive the further payment of $40.39 in full settlement for any and all claims arising out of the above injury." However, subsequently and under date of February 20, 1920, Dr. Besson wrote to the commission stating that Grant—

"comes in to-day, giving a typical history of frequent 'throwing out' of the knee and subsequent pain for two weeks or so. Examination shows the tender point at the location of the internal cartilage, and probably a rupture of the capsule of the joint, with a herniation at the synovial sac behind the joint. I would like to have an X-ray, and the man will probably need an operation. If you desire corroboration of these findings, kindly let me know at once, and also advise the man."

The commission's reply was as follows:

"Replying to your kind letter of February 20, beg to advise that it is agreeable with this commission that you proceed with such treatment as your professional judgment would indicate necessary in an effort to obtain the best result possible in the above case."

On February 28th, Dr. Besson gave to the commission a statement of the conditions found by him and also the conclusions drawn by him, and, among other things, he stated that in his opinion an operation was

necessary, but that since he would be "out of town
for about two weeks" he "would prefer not to un-
dertake the case until" his return.   The commission
replied saying: It "is agreeable with this commis-
sion" that "operative action be deferred until such
time as you return from out of town."

On March 23, 1920, the commission wrote to Dr.
Besson requesting that he "furnish us with a report
as to the condition and progress this workman is
making under your treatment."   Dr. Besson replied
on March 25th saying that Grant—

"was scheduled for operation and failed to appear.
I * * was informed that Grant wanted to wait
awhile, and was resting up.   Grant may improve
somewhat under various forms of treatment, but I am
certain that complete recovery will only come about
through an operation.   He seemed to approve my
findings and I am at a loss to account for his delay."

Under date of December 18, 1920, the examiner
wrote to the commission stating that:

"Mr. Grant wishes an appointment at the Portland
session on Friday, December 24, at 10:15 A. M.   He
is still having trouble with the loose cartilage in the
knee."

Grant presented himself on December 24th at the
Portland session, which was conducted by one member
of the commission and the commission's chief medical
examiner.   There is in the record a copy of the entry
which was made and signed by the commissioner and
chief medical examiner who conducted the Portland
session.   The entry reads as follows:

"Left knee has definitely loose internal semi-lunar
cartilage that has given trouble intermittently by slip-
ping out with resultant effusion into knee, since date
of injury.   Agreed to go to Dr. Dillehunt for removal
of same.   TTD to be reopened when operated."

On December 27th the commission wrote to Dr. Dillehunt as follows:

"From the Portland Session Memo of December 24, we learn that the above named workman has been referred to you for operative care. In order that we may properly compensate this man we request that you advise us the date he reports to you for treatment and also be particular to state the length of time he will be disabled in your opinion."

Under date of December 29, 1920, the attorneys for Grant wrote to the commission as follows:

"Mr. Grant states that on Friday last he was finally examined by Dr. Thompson (the Chief Medical Examiner) to establish the amount of permanent partial disability which he had and he was instructed at that time to report to Dr. Dillehunt at 3:30. Upon calling at Dr. Dillehunt's office he advised him that an operation was to be performed upon his knee that afternoon. Mr. Grant states that there must have been some misunderstanding in the matter as he has been informed by the physicians examining him and also I believe by Dr. Dillehunt and other physicians that they could not assure him that the operation would not cause him to have a stiff knee for life, and he feels that he does not want to take that chance but rather prefers to permit it to remain in the condition that it is now in, and therefore has requested that we write you and advise you of that fact and ask that you make such permanent partial disability as the records now before you warrant you in making.

"We believe that Dr. Besson and some other physician examined Mr. Grant a year or more ago and ascertained that he was permanently injured about the knee and requested that time that he await for about a year's time before being finally examined, this, however, your records will divulge. Mr. Grant was finally examined on Friday last in compliance with the request of the commission and your physicians."

The attorneys concluded their letter with a request that the commission make its final award before January 1st and "advise Mr. Grant or ourselves of your final decision in the matter." Under date of December 30th the commission replied to the attorneys saying:

"We acknowledge herewith receipt of your letter of December 29, asking that the commission make a lump sum payment in the above named case.

"As there has been no award made in this case nor do our records indicate that the man will suffer a permanent partial disability, it will be impossible for the commission to consider the payment of any compensation in a lump sum.

"Mr. Grant was examined at our Portland Office on December 24, by Dr. F. H. Thompson, our Chief Medical Examiner, and in the presence of Commissioner J. W. Ferguson he agreed to report to Doctor Dillehunt for an operation to remove a loose internal semilunar cartilage. This condition apparently has been giving him trouble since the date of his injury and the commission agreed to allow him time loss during the time he was disabled as result of the operation. The commission is willing to live up to its agreement with Mr. Grant, but we certainly will expect Mr. Grant to keep his part of the agreement.

"If he will report to Dr. Dillehunt for the operation to correct his condition, he will be paid time loss while disabled and his bill for medical attention will be taken care of by the commission. If, however, he does not care to submit to the proper treatment, the commission will not be in a position to allow him further compensation."

1. In the Circuit Court the commission moved to dismiss the appeal on the ground that the award made by the commission on December 15, 1919, was the last decision made by the commission. The statute, Section 6637, Or. L., provides that: "Any beneficiary not satisfied with the decision or findings" of the com-

mission may within thirty days after notice of the final action of the commission appeal to the Circuit Court. The motion to dismiss the appeal was denied and the commission assigns this ruling as error.

Grant contends that at no time did the commission consider or award or refuse to award compensation for permanent partial disability until December 30, 1920; that the letter of December 30, 1920, was notice of the decision made by the commission concerning the allowance of compensation for permanent partial disability, and that therefore his appeal was taken in time. It may be assumed that, since Grant returned to work on December 5, 1919, it was proper to discontinue compensation for temporary total disability and that the award made on December 15, 1919, was a final decision closing the question of compensation for temporary total disability. The reports and correspondence and conduct of the commission make it plain that the commission was at all times treating the case as one which was still open for consideration and for their decision, because of the uncertainty of future developments. Although the question of temporary total disability was closed, the question of permanent disability was regarded as being still open. The commission did not stand upon technicalities by requiring a formal written application to be filed with red-tape precision before exercising jurisdiction subsequent to December 15, 1919; but upon the contrary the commission continued to exercise jurisdiction after that date, and, as shown by the letters and reports received by the commission and the letters written and orders made by it, the commission was not only willing but laudably desirous of doing from time to time whatever developments might indicate was proper to be done.

The commission approved and paid bills rendered to it for medical and hospital services rendered in the months of February and March of 1920. Moreover, these services were authorized by the commission before they were rendered.

Grant testified that Dr. Besson "wanted to operate on it" but "Dr. Sheldon told me to let it go for a year, and maybe it would come back and be all right." Grant says that he was requested by physicians and by the officers of the commission to suspend the making of a claim for permanent partial disability for about one year in order that the development of the injury might be ascertained and a fixed condition made known before any order for permanent partial disability was made. The willingness of the commission to retain jurisdiction and the fact that it did retain jurisdiction is made clear by one of the commissioners who testified:

"When a man returns to work his time loss ends. He was returned to work with the idea of coming up later on when it is determined whether his condition was chronic, or, as the doctor explained, it would entirely recover. He came back in the fall of 1920, saying his condition was still remaining. We had a consultation and examination by doctors to determine what would be done for him. The result of the consultation was he should submit to an operation for the removal of the cartilage, because it had become chronic. * * He reported trouble with his knee. We said, 'All right, we will take care of it,' and called in the medical examiner. * * As soon as he reported back to us he had trouble with his knee we immediately took steps to take care of him. We called in the doctors to examine him, and advise what should be done. We told him, 'When you enter the hospital your time loss will be paid, your hospital bill and doctor bill.' * * When the doctor reported him able to go back to work on December 5th, that was notice to

the commission to close his time loss. If there is any further care required later on, the jurisdiction is continued, which we wanted to do in this case, and want to do still."

Having retained jurisdiction, and, acting under the authority of Section 6633, Or. L., the commission considered the question of the advisibility of an operation and deemed an operation reasonably essential to promote recovery, and announced that further compensation would not be allowed if Grant refused to permit an operation. The conclusion reached by the commission constituted a decision made in response to Grant's application for compensation for permanent partial disability. The letter of December 30, 1920, was notice of such decision; and consequently the appeal to the Circuit Court was taken within the time prescribed by the statute, for Grant appealed immediately after receiving the letter of December 30th.

The statement of facts already made should be supplemented by a narrative of such additional facts as are properly involved, before any attempt is made to answer the second question presented by this appeal. The doctor who first treated Grant advised him to submit to an operation. Dr. Sheldon, whom Grant consulted a few weeks after the injury, told Grant that it would be better to wait a year "before considering an operation," because "very often these cases make a complete recovery without operation, and if this recovery is to take place it usually takes place within a year. After it goes on over a year it probably becomes chronic." Grant says that he acted upon the advice of his physician and waited a year to ascertain what results might develop. At any rate, whether he acted upon the advice of the doctor or

upon his own inclination and judgment, Grant did in fact wait a year before further considering the advisability of an operation.

The cause was tried in the Circuit Court on February 7, 1921. Every doctor who saw Grant at any time between November, 1920, and the date of the trial gave it as his opinion that an operation was advisable. This was the view of Dr. Sheldon, who as previously explained had soon after the injury advised Grant to wait a year; it was also the opinion of two other surgeons who had examined Grant. Two surgeons who had not examined Grant gave testimony which tended to lend support to the conclusions reached by the medical men who had examined Grant. Apparently Grant's disability had by December, 1920, become chronic and permanent. The evidence is sufficient to support the inference that unaided nature will not cure the present condition of the knee and that no kind of medical treatment, except a successful operation, can correct the present disability.

In obedience to directions given at the Portland Session of December 24, 1920, Grant presented himself to Dr. Dillehunt. It appears from the record that Grant knew of a man who "got hurt, he got operated on, and he got a stiff knee," and Grant was afraid that he, too, would have a stiff knee if operated upon. When Grant presented himself to Dr. Dillehunt he asked the doctor if the latter would guarantee that an operation would not result in a stiff knee; and when the doctor stated he would not give such an assurance, Grant refused to submit to an operation.

All the medical men declared that the operation required to correct the disability is known as a major operation. One surgeon said that it was a serious

operation using the word "serious" in the sense that "if anything did go wrong it is serious to the individual." An anesthetic is necessary. One witness testified:

"It is not a common operation. I don't know of any surgeon that has done a great number of those operations. We occasionally operate on one."

An operation terminates either in a cure or ankylosis. The principal danger is the risk of infection. One witness declared that infection was practically the only danger. One surgeon testified, and no witness denied, that—

"the knee-joint is a very complicated joint, and infection is more apt to take place in the knee-joint than any other place in the body. The asepsis must be absolutely perfect in an operation on the knee-joint."

One of the medical witnesses had personal knowledge of about twenty operations, all of which were successful; another witness was present at two operations which were not successful. The medical men were agreed that the operation is usually successful. One witness stated that about one operation in a hundred resulted in a stiff knee.

Witnesses who undertook to estimate the percentage of Grant's present disability differed in their estimates. One witness stated that the disability was between 30 and 40 per cent; another placed the disability at 50 per cent; and still another said that the percentage of disability was between 25 and 75 per cent, explaining that it was difficult to figure the degree of disability, because there is no way of knowing in advance "when it [the knee] is going to lock and give him trouble." The present condition of the knee is such that—

"every once in awhile a part of the cartilage in the knee slips out of place, and sort of locks his knee. It doesn't do that all the time, but if he makes a certain motion it gets into a tight place, causes a locking of the knee * * every time that cartilage slips out of place, it causes an irritation of the joint. A swollen joint has pain, and impairment of function, loss of motion, so he cannot step on it. * * gets out of place * * every once in awhile; no telling how often it will do that, but it usually does that quite frequently. * * It will cause total disability at times, partial disability at other times."

Speaking of the advisability of the operation one surgeon thought a stiff knee would be preferable to Grant's present condition. Another surgeon stated that he—

"would hardly be prepared to say which would be preferable; it would depend on how much interference this cartilage is in performing his duties; it also depends on what position the knee would be ankylosed in if it became stiff";

and continuing with his testimony this same witness declared:

"In a stiff knee you have complete limitation of motion"; but with a loose cartilage and bandage "he would have practically full flexibility, part of the time, except the time when there was locking of the knee or immediately after there was any pain or swelling. It would be a question I think up to the individual."

The verdict of the jury consisted of special findings as follows:

"We, the jury * * find that the plaintiff has reasonable ground for the refusal to be operated upon for a correcting of the loose semi-lunar cartilage of the left knee; and we * * do hereby find for the plaintiff that he is 75 per cent permanently partially disabled in the loss of efficiency and use of his left knee."

Based upon the verdict the Circuit Court adjudged that Grant is entitled to an award of 75 per cent disability "of the loss of function of the left knee and the left knee-joint," and ordered the commission to make an award to Grant based upon such loss.

Whether or not Grant is entitled to receive compensation for a permanent partial disability on account of the present condition of his knee depends upon whether he was or was not obliged to submit to an operation; and the question as to whether or not he was obliged to submit to an operation before he could be awarded compensation for permanent disability depends upon (1) the construction given to that provision of the statute which relates to surgical operations; and (2) the facts. We must, therefore, first determine the scope of the statute, and then ascertain whether the facts of the instant case are such as to make submission to an operation a condition precedent to the right of compensation.

So far as it is material here Section 6633, Or. L., reads as follows:

" * * For such period of time as any workman * * shall refuse to submit to such medical or surgical treatment as the commission deems reasonably essential to promote his recovery, his right to compensation shall be suspended and no payment shall be made for such period, and the commission may reduce the period during which such workman would otherwise be entitled to compensation to such an extent as they shall determine his disability shall have been increased by such refusal."

The important words in Section 6633, Or. L., are:

"Such medical or surgical treatment as the commission deems reasonably essential to promote recovery."

These important words did not appear in the Workmen's Compensation Law as it was originally enacted in 1913, but they first appeared in an amendment adopted in 1917: Laws 1913, c. 112, § 28; Laws 1917, c. 288, § 14.

Perhaps the task of construing Section 6633, Or. L., will be lightened if we now inquire about the rule prevailing in other jurisdictions; for possibly any seeming ambiguity in the language of our statute may be clarified when it is read in the light of the rule prevailing in other jurisdictions.

In practically all, if not all, the workmen's compensation statutes it is provided that every workman shall receive compensation for an injury resulting from an accident arising out of and in the course of his employment. The workman's right to compensation depends upon whether the accident arises out of and in the course of his employment, and if it does the workman is entitled to compensation. The loss sustained by the injured workman is attributed to the employment and the workman is given a legal right to compensation. The statute does not create a charity, nor does it allow damages in the sense in which the word "damages" is commonly employed; but, taking notice of the inequalities growing out of the old system, legislatures have responded to the public demand for a new system which would obviate the delays attending personal injury litigation and at the same time shift the burden of economic waste from the workman to the industry, in order that it may ultimately be borne by the consumer as a part of the necessary cost of production: *State* v. *Industrial Com.*, 92 Ohio St. 434 (111 N. E. 299, Ann Cas. 1917D, 1162, L. R. A. 1916D, 944). After the injury is sustained, however, it may appear that an operation

will diminish or correct the disability which origi-
nated in the employment. There are some operations
to which a workman must submit or else lose his right
to compensation; and so, too, there are cases where
the workman may refuse to be operated upon without
losing his right to compensation. The doctrine de-
barring the workman from compensation in cases
where his refusal operates as a bar proceeds on the
theory that continuance of his disability is due to his
own unreasonable conduct and not to the employment.
This is only a recognition of the legal principle that
an individual whose person or property is injured
must do whatever is reasonably proper to lessen the
loss. Such being the theory of the doctrine we would
expect to find, as we do, that the test for determining
the rights of the workman is whether his conduct is
that of a reasonable man. When the issue arises,
with the workman contending that his refusal is rea-
sonable and the commission asserting that it is not
reasonable, it is an issue of fact, and is to be decided
like the issue of negligence in an action at law. Of
course in cases involving claims of workmen for com-
pensation just as in cases alleging negligence the facts
may be such that it can be said as a matter of law
that the workman's refusal is unreasonable; but
usually the question is one of fact to be determined
by the triers of the facts. Courts take notice of that
which is common knowledge and experience; and,
therefore, when the admitted facts disclose a case
which the general knowledge and experience of men
condemn at once as unreasonable, it is the duty of the
court to declare it unreasonable as a matter of law.
*Walsh* v. *Oregon Ry. & Nav. Co.,* 10 Or. 250, 255.
The American courts with practical unanimity have
adopted the formula prescribed by LORD M'LAREN in

*Donnelly* v. *William Baird & Co.,* Scotch Sess. Cas. (1908) 536, Scot L. R. 394 (1 B. W. C. C. 95):

"In view of the great diversity of cases raising this question, I can see no general principle except this, that if the operation is not attended with danger to life or health, or extraordinary suffering, and if according to the best medical or surgical opinion the operation offers a reasonable prospect of restoration or relief from the incapacity from which the workman is suffering, then he must either submit to the operation or release his employers from the obligation to maintain him. In other words, the statutory obligation of the employer to give maintenance during the period of incapacity resulting from an accident is subject to the implied condition that the workman shall avail himself of such reasonable remedial measures as are within his power. I think that this statement is in accordance with all the decisions that have been given in similar cases, but in whatever way the condition is defined each case must be considered as a circumstantial case depending on the nature of the proposed operation and its probable results. I do not think that in principle any distinction can be taken between medical treatment and surgical treatment as regards the duty of the patient to co-operate with his professional advisers towards his own restoration to health and working capacity. The distinction only begins when an operation is proposed which may be attended with danger, or the results of which are not in the region of reasonable and probable success."

See also: *Vonnegut Hardware Co.* v. *Rose,* 68 Ind. App. 385 (120 N. E. 608, 610); *Enterprise Fence & Foundry Co.* v. *Majors,* 68 Ind. App. 575 (121 N. E. 6); *Floccher's Case,* 221 Mass. 54 (108 N. E. 1032); *McNally* v. *Hudson & M. R. Co.,* 87 N. J. L. 455 (95 Atl. 122); *O'Brien* v. *Albrecht,* 206 Mich. 101 (172 N. W. 601, 6 A. L. R. 1257); *Lesh* v. *Illinois Steel Co.,* 163 Wis. 124 (157 N. W. 539, L. R. A. 1916E, 105);

*Jendrus* v. *Detroit S. P. Co.*, 178 Mich. 265 (144 N. W. 563, Ann. Cas. 1915D, 476, L. R. A. 1916A, 381); *Kricinovich* v. *American Car & Foundry Co.*, 192 Mich. 687 (159 N. W. 362); and note in 6 A. L. R. 1260. The opinion in *Guild* v. *Portland R. L. & P. Co.*, 64 Or. 570 (131 Pac. 310), is of interest in connection with the question under discussion.

We have not discovered any jurisdiction where the commission or other body administering the statute is given arbitrary power to prescribe an operation under inevitable penalty of loss of compensation in case of refusal by the workman; nor does any statute to which our attention has been called make the right of refusal depend upon the balance of medical opinion. The opinions of medical men, whether divided or unanimous, are not alone and of themselves necessarily controlling. In every jurisdiction the right of the workman is dependent upon his conduct, and his conduct is measured by the course which would be pursued by an ordinarily reasonable man.

2. Our statute must not receive a narrow construction, nor should it be so freely interpreted as to give a right which the words themselves do not fairly import; and yet it must be liberally construed. Manifestly, the legislature did not intend to confer upon the commission any arbitrary power to prescribe an operation regardless of the pain and suffering accompanying it or the consequences flowing from it. Finding as we do that now as well as prior to 1917 other jurisdictions, both American and British, have adopted and consistently adhered to the rule of reasonableness, we should expect also to find the same rule in our own statute; and it would be surprising to find a provision in our statute giving arbitrary power to the commission, or making the workman's right of

refusal dependent upon medical opinion alone, and entirely ignoring the viewpoint of the workman who is the only one who must take whatever risk is involved, must endure whatever suffering is to be borne, and must accept whatever ill effects may result from the operation. When the commission "deems" it decides; and the commission cannot decide whether an operation is reasonably essential to promote recovery unless it takes into consideration all the facts, including the present condition of the workman, the degree of pain accompanying and following the operation, the danger to life or health, and the probable results of the operation.

When the statute is read in the light of the humane purposes which it was designed to accomplish and is viewed in the light of the rule which elsewhere has been adopted without dissent or protest, and is then interpreted liberally, as it ought to be, it will clearly appear that the words "reasonably essential" are used in a relative sense and imply the necessity of considering not merely the opinions of medical men but all the facts before attempting to decide. It is appropriate in this connection to say that the commission is not in the instant case charged with having exercised its power arbitrarily; but upon the contrary we understand from the record that the commission has earnestly endeavored to carry out the spirit as well as the letter of the statute as it understood the statute. The present controversy arose out of a difference of opinion concerning the meaning of Section 6633, Or. L. The commission was guided by the opinions of the doctors, apparently on the theory that the opinions of the medical men were conclusive, especially when they agreed, as they did in the instant case, that an operation was advisable.

3. Our conclusion is that our statute should be construed to mean that the workman's right to compensation is to be suspended if he refuses to submit to an operation to which an ordinarily reasonable man would submit if similarly situated. Usually the conduct of a workman is a question of fact to be decided by the triers of the facts. Our statute provides that in the Circuit Court "either party thereto may demand a jury trial upon any question of fact." Section 6637, Or. L. If the facts are admitted and reasonable men would draw the same inferences from those facts, generally the question for decision becomes one of law for the court to decide; but where the facts are in dispute, or where reasonable men would draw different inferences from admitted facts, the question is one of fact for the jury and not one of law for the court: *Greenwood* v. *Eastern Oregon Power Co.*, 67 Or. 433, 441 (136 Pac. 336); *Gibson* v. *Payne*, 79 Or. 101, 105 (154 Pac. 422, Ann. Cas. 1918C, 383); *Strang* v. *Oregon-W. R. & N. Co.*, 83 Or. 644, 651 (163 Pac. 1181).

4, 5. If in a given case it can be said that the workman is refusing to undergo a safe and simple operation, which if performed by a competent surgeon is fairly certain to result in removal of the disability and is not attended by serious risk or extraordinary pain, and one to which an ordinarily prudent and courageous person would submit for his benefit and comfort, no question of compensation being involved, then it can be said that the continued disability of the workman is the direct result of his own unreasonable refusal: *Lesh* v. *Illinois Steel Co.*, 163 Wis. 124, 131 (157 N. W. 539, L. R. A. 1916E, 105). In the instant case the operation is a major one and there is a

risk of producing a result which some persons might deem worse than Grant's present condition. Even though it be assumed that all the material facts are admitted, nevertheless it is obvious that reasonable men may differ as to whether Grant acted reasonably in refusing to submit to the proposed operation. Each case will depend largely upon its own facts and circumstances; but it appears to us that the facts and circumstances related in the record here were such as to make the question for decision one of fact for the jury and not one of law for the court. The jury decided that Grant's refusal was reasonable; and the court is bound by that decision of the jury. Section 6637, Or. L. It is true that the verdict of the jury did not follow the exact language of the statute, but we think that the verdict is sufficient when it is read in the light of our construction of the statute.

6. We are also of the opinion that it was proper to permit the jury to determine the percentage of disability. The order of the Circuit Court is affirmed and the commission is directed to fix the compensation in accordance with the findings in the verdict.

Affirmed.