Argued and submitted February 13, reversed; referee's order reinstated September 5, reconsideration denied October 19, petition for review withdrawn October 24, 1984

(298 Or 151)

In the Matter of the Compensation of
Zoi Sarantis, Claimant.

SARANTIS,
*Petitioner,*

*v.*

SHERATON CORP.,
*Respondent.*

(81-08881; CA A29235)

688 P2d 99

Richard A. Sly, Portland, argued the cause for petitioner. With him on the brief was Bloom, Marandas & Sly, Portland.

Allan M. Muir, Portland, argued the cause for respondent. With him on the brief were Ridgway K. Foley, Jr., William H. Replogle and Schwabe, Williamson, Wyatt, Moore & Roberts, Portland.

Before Gillette, Presiding Judge, and Van Hoomissen and Young, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

Claimant, an immigrant Greek woman in her early 50's, injured her lower back while working as a maid for respondent's Lloyd Center Sheraton Hotel in Portland. She has been in constant pain since the injury, and a referee awarded her permanent total disability. The Workers' Compensation Board reduced the award to 70 percent permanent partial disability, finding that claimant's refusal to undergo a laminectomy was unreasonable. On *de novo* review, we reverse and remand.

Although the statutes do not explicitly provide that a permanent disability award should be reduced if the claimant unreasonably refuses to submit to recommended treatment, such a reduction is implicit in Oregon's Workers' Compensation Law. The reason is that, to the extent that the rejected treatment would improve the claimant's condition, the disability is attributable to the claimant's unreasonable refusal rather than to the employment. *Nelson v. EBI Companies,* 296 Or 246, 674 P2d 596 (1984); *Grant v. State Industrial Acc. Com.,* 102 Or 26, 41-42, 201 P 438 (1921); *Clemons v. Roseburg Lumber Co.,* 34 Or App 135, 138-39 n 2, 578 P2d 429 (1978); 1 Larson, Workmen's Compensation Law, § 13.22.

The crucial issue in this case is the reasonableness of claimant's refusal. This is an appropriate occasion to explain further the criteria by which we determine reasonableness in cases of this sort. We have previously said that the test for reasonableness is "whether, if compensation were not an issue, an ordinarily prudent and reasonable person would submit to the recommended treatment." The relevant factors include "the worker's present physical and psychological condition, the degree of pain accompanying and following his treatment, the risks posed by the treatment, and the likelihood that it would significantly reduce the worker's disability." *Clemons v. Roseburg Lumber Co., supra,* 34 Or App at 139. The employer has the burden of showing a refusal to be unreasonable. *Nelson v. EBI Companies, supra,* 296 Or at 252.

There usually is not just one "correct" decision about the advisability of a course of treatment. Workers have the right to decide whether to undergo treatment, and we determine only whether a decision is reasonable. The law does not force all workers into the same mold. It provides them with

discretion to make their own decisions about their own lives but protects employers from paying for unreasonable exercises of that discretion.

> "[I]t would be surprising to find a provision in our statute giving arbitrary power to the commission, or making the workman's right of refusal dependent upon medical opinion alone, and entirely ignoring the viewpoint of the workman who is the only one who must take whatever risk is involved, must endure whatever suffering is to be borne, and must accept whatever ill effects may result from the operation." *Grant v. State Industrial Acc. Com., supra,* 102 Or at 44.

■ The question, then, is how we as factfinders determine whether a particular decision is within the range of discretion the law grants the worker. One way to answer it is by stating what we do *not* do: We do not determine whether we would ourselves choose to undergo the treatment, nor whether a different worker would do so. Rather, to find the refusal unreasonable, we must find that *no* reasonable person would refuse: "[A]n ordinarily prudent and reasonable person *would submit* to the recommended treatment." *Clemons v. Roseburg Lumber Co., supra,* 32 Or App at 139. (Emphasis supplied.) The test is objective, which means that we do not decide whether this particular claimant's *reasons* for refusal are reasonable; rather, we decide whether the *decision* itself is within the range of decisions reasonable people might make.

■ Our evaluation of a claimant's decision by an objective standard of reasonableness has certain consequences. First, we apply the test of reasonableness to the situation as the claimant knew it; medical or other information of which the claimant was unaware or was unable to appreciate is irrelevant in determining whether the decision was reasonable.[1] Second, the claimant's personal characteristics, including his or her physical and psychological condition, are relevant only to the extent that they affect the claimant's ability to undergo the treatment and achieve a successful result. Third, external influences or irrational fears, no matter how genuine, do not excuse an otherwise unreasonable refusal. Finally, we necessarily consider the risks and pain of the

---

[1] Of course, if the issue is a continuing refusal to undergo treatment, information which the claimant learns in the course of a hearing, or otherwise after the original refusal, may be relevant to whether the refusal continues to be reasonable.

treatment from the claimant's, not the physician's, perspective. There is a significant distinction between the detached analysis of a surgeon who performs many operations and the interested analysis of a worker who must decide whether to undergo *this* operation. *Clemons v. Roseburg Lumber Co., supra,* 32 Or App at 139-140.

Previous decisions and other authority provide examples of how to apply this test. Larson states, almost as an axiom, that, when there is a real risk involved in the proposed medical treatment, a claimant cannot be forced to undergo that risk at the peril of losing compensation. 1 Larson, Workmen's Compensation Law, § 13.12 at 3-410 to 3-434. That statement is consistent with previous Oregon cases, which have consistently upheld compensation despite refusal of medical treatment that involved a significant risk. *See Grant v. State Industrial Acc. Com., supra* (refusal to undergo a knee operation that involved an apparently small risk of a permanently stiff knee); *Reef v. Willamette Industries,* 65 Or App 366, 671 P2d 1197 (1983) (refusal to undergo a myelogram); *Gainer v. SAIF,* 50 Or App 457, 623 P2d 1093 (1981) (refusal to undergo myelogram and resulting probable laminectomy); *Clemons v. Roseburg Lumber Co., supra,* 34 Or App at 140 (refusal to undergo relatively painful transaxillary rib resection which required general anesthesia); *Finley v. SAIF,* 34 Or App 129, 578 P2d 432 (1978) (refusal to undergo myelogram). We now apply our test to this case.

Claimant came to this country in the late 1970's. She has a third grade education and speaks only Greek. Until her injury, she had never been in a hospital or seen a doctor. She has done physical labor since she was a child, hoeing in the fields before her marriage at age 16 and working in a variety of factory jobs in Greece, Germany and this country before taking her position with respondent. She was injured while folding up a new sleeper sofa after making the bed; the mattress was tight and she strained her back trying to force the sofa together.

After her injury, claimant was taken to a hospital emergency room, where she was treated and referred to an orthopedist. She saw the orthopedist regularly for a year, cooperating readily with his recommended treatment. During this period, she was evaluated by Orthopaedic Consultants

and, later, by a neurologist; they generally concurred in her orthopedist's conservative treatment. About a year after the injury, she moved to another part of the city. Her vocational rehabilitation counselor, who apparently disapproved of her orthopedist's approach, sent her to a different orthopedist closer to her new home. The new orthopedist referred her to Dr. Parsons, a neurosurgeon, who performed a myelogram, which revealed a loss of nerve root sleeve and a probable extruded disk in the lower lumbar region. Parsons recommended a laminectomy on the right side, stating that it provided a 75 percent chance of improvement and could make claimant able to return to work. After consulting with her family, claimant refused the operation.

■      After claimant's refusal and another evaluation by Orthopaedic Consultants, the department issued a determination order granting her 40 percent unscheduled permanent partial disability. The referee awarded her permanent total disability, which the Board reduced to 70 percent permanent partial disability because of her refusal of the operation. Although respondent makes a *pro forma* argument otherwise, we find that the only possible basis for an award of less than permanent total disability is that her refusal to undergo the operation was unreasonable.

Claimant refused the operation because of her fear of the risks involved.[2] As she put it, she did not want to spend the rest of her life in a wheelchair or on her knees praying. She knew of other people who had had operations and had ended up in wheelchairs, and she was afraid of joining them. She had cooperated with her physicians until that time and had been eager to change to a new physician who would pursue more aggressive measures because of her frustration over her lack of progress. All of her cooperation with her physicians, however, had produced no positive results. She felt increasingly hopeless about improvement, and her self-esteem had fallen drastically because of her inability to work, either inside or outside

---

[2] She also stated that she was afraid of "the knife." In the context of her testimony we believe that her fear of the knife was partly a resistance to all surgery and partly another way of expressing her fear that the operation might cause permanent damage.

the home. Her family discussed the matter and strongly urged against the operation.[3]

Before the laminectomy issue, claimant was a totally cooperative patient who complied with all treatments and recommendations of her physician. When conservative methods did not work, she agreed to and underwent a myelogram. Her only refusal, therefore, has been of the laminectomy. Claimant's knowledge of the risks inherent in that operation is unclear from this record. She does not speak English, her husband's English is poor, and there was not always an interpreter available to her. Therefore, it is very difficult to determine what information she actually obtained from the doctor. Although Dr. Parsons stated in a letter that he told her that there was a 75 percent chance of improvement and that the risks were not as great as she feared, he did not state what he told her the actual risks were. Claimant and her husband testified that they understood the doctor to say that there was a 50 to 75 percent chance of improvement but that it would be fate if claimant ended up in a wheelchair and that she might end up in a wheelchair without the operation. When claimant decided not to have the operation, she knew that there was a good possibility that it would improve her condition. She also knew that there was a possibility that it would make her worse and that there was a possibility that she would get worse without it.

We have noted in previous cases that a myelogram, a less serious procedure than a laminectomy, causes significant pain. It is clear that no major surgery is without some risk of serious disability or death. Although there is a good possibility that the surgery would improve claimant's condition, there is also a possibility that it would make her worse. A 75 percent chance of improvement has the necessary corollary of a 25 percent chance of no improvement or of worsening. Claimant may worsen without regard to the surgery. This is exactly the kind of situation in which there can be more than one possible reasonable answer. Claimant balanced the risks as she understood them against the potential benefits and concluded that she would not consent to the surgery. We cannot say that her

---

[3] Claimant's husband testified that, when he talked with their son (who is still in Greece) about the situation, the son threatened to kill his father if claimant ended up in a wheelchair because of the operation.

decision is outside the range of decisions reasonable people might make. She is entitled to an award of permanent total disability.

Reversed; referee's order reinstated.