Argued and submitted February 1, 1988, on appeal in case no. A8309-05871, paragraphs 1 and 2 of judgment vacated, paragraph 5 reversed, otherwise affirmed; on cross appeal, paragraph 6 of judgment reversed in part, otherwised affirmed and remanded for further proceedings; case no. A8411-06749 affirmed on appeal and cross-appeal January 11, 1989, reconsideration allowed by opinion May 24, 1989

See 96 Or App 658 (1989)

CHILES et al,
*Appellants - Cross-Respondents,*

*v.*

ROBERTSON et al,
*Respondents,*

*and*

FRED MEYER REAL ESTATE
PROPERTIES, LTD., et al,
*Respondents - Cross-Appellants,*

DUANE COMPANY et al,
*Nominal Defendants - Respondents.*

FRED MEYER, INC., et al,
*Respondents - Cross-Appellants,*

*v.*

SOUTHEAST COMPANY,
*Appellant - Cross-Respondent,*

FRED MEYER LIQUIDATING CORP.,
*Respondent - Cross-Appellant.*

(A8309-05871, A8411-06749; CA A42591)

767 P2d 903

Michael E. Arthur, Portland, argued the cause for appellants - cross-respondents. With him on the briefs were Frank E. Nash, Bruce A. Rubin and Miller, Nash, Wiener, Hager & Carlsen, Portland.

Barnes H. Ellis, Portland, argued the cause for respondents and respondents - cross-appellants. With him on the briefs were Charles F. Hinkle, Joyce A. Harpole and Stoel, Rives, Boley, Jones & Grey, Portland, and H. Steven Wilson and Latham & Watkins, Los Angeles, California.

No appearance for nominal defendants - respondents.

Before Warden, Presiding Judge pro tempore, and Warren and Rossman, Judges.

WARREN, J.

## WARREN, J.

This appeal involves two cases that were consolidated for trial and on appeal. *Chiles v. Robertson,* the primary case, is a combined shareholders' derivative and direct action. Plaintiffs are minority shareholders in six closely held real estate companies (RECs). The RECs and their predecessors were created over several decades for the purpose of building and owning stores that they leased to Fred Meyer, Inc., an Oregon corporation (Old FMI). Defendants are Old FMI, which owned the majority of the RECs' shares, several entities that participated in the purchase of Old FMI through a leveraged buyout in 1981, and individual partners in or directors of Old FMI, the purchasing entities and the RECs.[1]

Plaintiffs allege that defendants committed various breaches of the fiduciary duties that they owed plaintiffs and the RECs as directors of the RECs and as their majority shareholder. The most important claims arise from the RECs' consents, over plaintiffs' objections, to assignments of the lessee's interests in leases between Old FMI and the RECs. Old FMI used its control of the RECs to require them to consent to Old FMI's assignments of those interests to the purchasing entities but made no attempt to obtain any benefit for the RECs from the change. Plaintiffs also allege that defendants ignored the interests of the RECs or of the minority shareholders of the RECs in a number of other actions that they took over a period of years.

The trial court found that plaintiffs had proved some of their claims. It ordered defendants to purchase plaintiffs' interests in the RECs at the price that the court established.[2] Plaintiffs contend that the RECs should be dissolved and their assets distributed instead of merely requiring defendants

---

[1] The RECs are nominal defendants but have not taken an active role in the portions of the litigation involved in this appeal.

[2] In paragraph 1 of the judgment, the trial court ordered several corporate defendants to purchase plaintiffs' shares in the RECs for a total price of $12,016,818, exclusive of interest. In paragraph 2 it established the procedure for the purchase. In paragraph 3 it ordered those defendants to pay plaintiffs a total of $31,262 for a number of minor claims against three of the RECs. In paragraph 4 it declared that the RECs held their properties free of any constructive trust in favor of the corporate defendants. In paragraph 5 it dismissed plaintiffs' remaining claims with prejudice. In paragraph 6 it authorized but did not award attorney fees to plaintiffs, and in paragraph 7 it authorized but did not award costs to plaintiffs.

to purchase plaintiffs' interests in the RECs. They also assert that the price that the court set was too low. Defendants, in their cross-appeal, assert that the trial court erred in a number of respects, the net result of which was to require them to pay more for the RECs than they are worth.

In the companion case, *Fred Meyer, Inc. v. Southeast Company,* several of the defendants in *Chiles v. Robertson,* as plaintiffs, sought an injunction prohibiting Southeast Company, an REC that plaintiffs[3] control and that had refused to consent to the assignment of its lease, from terminating that lease on the ground that the assignment was a breach of the lease. The trial court granted the injunction, and plaintiffs appeal. Because *Chiles v. Robertson* raises most of the issues in both appeals, we will focus generally on it. On *de novo* review, we reverse and remand on the appeal and on the cross-appeal in *Chiles v. Robertson* and affirm on the appeal in *Fred Meyer, Inc. v. Southeast Company.*[4]

## CHILES v. ROBERTSON: FACTS

Plaintiffs are Virginia Chiles, the widow of Earle A. Chiles (Chiles), acting both for herself and as the executrix of his estate, and Earle M. Chiles, their son. Chiles was the son of Eva Chiles Meyer and the stepson of Fred G. Meyer (Meyer). Meyer founded and, until his death in 1978 at the age of 92, dominated Old FMI, which under his control became the largest retailer in Oregon and one of the most important in the Pacific Northwest. Meyer developed stores that sell a wide variety of nonfood items and also have an extensive grocery department. His goal was to carry as many kinds of merchandise as possible, in the belief that customers coming for one thing would stay to buy another. In that way, they would become accustomed to looking to his stores to satisfy most of

---

[3] Our references to plaintiffs and defendants throughout this opinion are to the designations in *Chiles v. Robertson.*

[4] There is a multitude of issues in this case. The record consists of over 20,000 pages of transcript and over 2000 exhibits. The actual trial took six months, and other hearings consumed additional months of court time. The trial court required 41 pages of single-spaced typing for its excellent and very helpful memorandum opinion. The briefs total over 150 pages on each side, exclusive of abstracts and appendices. Because of this bulk, we write only about those matters that are necessary to our disposition of the case. Our failure to mention a particular argument should not be taken as a sign that we are unaware of it or as an indication of how we would rule if a ruling were necessary.

their needs. As a result of Meyer's approach, Fred Meyer stores are usually designed to provide a large amount of open space under a single roof, a design that could make it difficult to adapt their buildings for use by retailers with different marketing strategies.

Until 1960, Old FMI was a privately-held corporation. Meyer, Eva Meyer and Chiles were the only stockholders. During that period, Meyer developed a method for locating, building and financing new stores that he continued to follow until the late 1960s. That method created relationships, both among the businesses and among their owners, that are the source of the disputes in these cases.

Beginning in the 1920s, and growing with Old FMI's expansion out of the downtown Portland area in the 1930s, Meyer formed separate corporations, the RECs, in which he, his wife and, starting in the 1930s, Chiles were the only shareholders, to purchase the land for and then to build each store. Each REC was thinly capitalized and financed the construction of its store by mortgaging the property to a bank or to an insurance company. The REC then entered into a long term lease of the store to Old FMI and assigned its interest in the lease to the lending institution as security for the loan. Each lease lasted for at least the term of the mortgage, and the rentals were generally about ten percent greater than the mortgage payments. The loan was also often greater than the cost of constructing the store. Through this system, Old FMI acquired a new store without going into debt, the REC earned enough to pay the underlying loan, provide for the upkeep of the facility and accumulate money to buy land for the next project and, as Meyer intended, the value of the property that the REC owned increased steadily at no expense to its shareholders.

Meyer originally created a new REC for each store, so that the debt from one store would not affect the financing of the next. This practice, when combined with his habit of treating the RECs as subordinate to his overall plans for Old FMI's development, resulted in complex connections among them. Some RECs accumulated cash, while others had demands greater than their resources. To resolve these problems, RECs loaned money to one another and traded properties around as

convenient. Those arrangements were not always accompanied by the necessary formalities, and sorting out the interrelationships of the RECs became increasingly difficult.

When Old FMI became a public corporation in 1960, shortly after Eva Meyer's death, the close ties between the RECs, on the one hand, and Meyer and Chiles, who remained the largest shareholders of Old FMI, on the other, subjected the company to criticism from securities professionals and prevented its listing on the New York Stock Exchange. In addition, changes in accounting standards made financing through independent corporations less attractive. Those problems led to a change in the system for financing new stores. In 1968, Old FMI formed Fred Meyer Properties, Inc. (Old Properties), as a wholly owned subsidiary. Old Properties thereafter purchased land and developed most new Fred Meyer stores. The only exceptions that are relevant to this case are the stores in Gresham and Clackamas. Two different RECs had purchased the sites for those stores before the change in policy and remained the ground landlords when Old Properties built the stores in the 1970s. Despite the change in policy, the RECs remained the owners and lessors of the stores that they had originally developed.

Although Meyer dominated Old FMI,[5] Chiles played an important role beginning in the 1930s, including serving as

---

[5] An attorney who represented Chiles summarized a 1974 conversation with him in a contemporary memorandum:

"Mr. Meyer is extremely domineering. Mr. Chiles was president of Fred Meyer, Inc., and a member of the board of directors of both Fred Meyer, Inc., and Meyer Foundation, but Mr. Meyer was the *boss*. Mr. Chiles and others close to Mr. Meyer (including Mrs. Meyer) had a distinctly lower order of authority." (Emphasis in original.)

Gerald Pratt, who was a close associate of Meyer during the last two decades of his life, and who served on the boards of the RECs, testified:

"Q Incidentally, on these minutes of the Real Estate Companies, it was Mr. Meyer's practice, wasn't it, to circulate those to the directors and have each director sign them?

"A Yes. Sometimes you signed them before they were done.

"Q I take it you wouldn't sign a document if its recitations weren't accurate to your satisfaction, would you?

"A *You would if you worked for Mr. Meyer.*"

The record is replete with other evidence confirming Meyer's complete domination of the business and of all who worked with him. Those who would not bow to him simply left.

president from the early 1950s until he retired in 1968. Eva Meyer was also active in the business until her death in 1960. While Eva Meyer was alive, Chiles acted in almost complete subordination to Meyer. After her death, Chiles began to express some of his disagreements with Meyer, including disagreements over Meyer's handling of the RECs. He did not, however, significantly challenge Meyer's control.[6] Eva Meyer left Chiles some of her stock in the RECs, and he purchased other shares from the foundation that she established in her will. Those shares, when combined with his previous holdings, made Chiles a substantial minority shareholder in most of the RECs and gave him the majority interest in Southeast Company. He also owned two RECs outright, while he and Meyer each owned half of the stock in the remaining one.

The complexities that the RECs had spawned, and Meyer's desire as he grew older to bring order to his estate, led him to merge a number of the RECs that he controlled. By his death he had reduced the number of those RECs to five, in addition to the one in which he had a half interest. His goal was to merge all of the RECs into Old FMI, taking stock in that company in exchange. Chiles, however, was not satisfied with Meyer's proposed price and would not agree to a merger without an appraisal of the properties that the RECs owned. Meyer resisted that suggestion and instead decided to sell all of his REC shares to Old FMI. A plan to do so was pending when he died; soon afterwards, Old Properties purchased those shares from his estate, paying for them with Old FMI stock.

Meyer's and Chiles' roles as owners of the RECs and their roles as major shareholders of Old FMI created obvious conflicts of interest. The conflicts became particularly acute after Old FMI went public. Because Meyer considered the RECs to be subordinate to Old FMI's interests, and because he wanted to avoid complaints, he generally resolved the conflicts against the RECs. Chiles did not always agree with that approach.

After Meyer's death and Old Properties' purchase of his stock in the RECs, the nature of the conflicts of interest

---

[6] In 1970 and 1971, however, Chiles did take control of the Meyer Foundation (now the Chiles Foundation), which Eva Meyer had established in her will.

changed in ways that Old FMI's new management, which now controlled the majority shareholder of the RECs, did not always appreciate. Chiles was still the minority shareholder, but the majority was no longer another person; rather, it was the very entity to which the RECs leased their properties. Previously, the primary conflict had been the danger that the owners of the RECs would use their positions with Old FMI to benefit the RECs at the expense of Old FMI. Now, the conflict was the danger that Old FMI would use its control over the RECs to benefit itself at the expense of Chiles.

Meyer's death also gave Chiles the opportunity to assert his interests with a strength that he had not previously shown. His major concern was that, although he was on the boards of the RECs that Old FMI controlled, he had no real involvement in what they did. Instead, he believed, Old FMI's management continued to dominate them in the same way that Meyer had, informing him of decisions after the fact, if at all. The difference was that Chiles had no reason to defer to the new management, many of whose members had once been his subordinates, as he had deferred to Meyer. In response to his concern, Chiles' and Old FMI's lawyers negotiated an agreement under which Chiles and his son would have two of the five seats on reconstituted REC boards, Old FMI management would keep Chiles informed of significant developments, REC board meetings would actually discuss REC business and Old FMI's attorneys would share representation of the RECs with counsel representing Chiles. This "Realty Company Proposal" reached its final form in April, 1981, but, because of the purchase of Old FMI later that year, its impact was limited. It nevertheless represented some recognition by the parties of the responsibilities arising from Old FMI's control of the RECs.

When Meyer died, he owned about 27 per cent of the shares of Old FMI, including the shares that his estate received in exchange for the REC shares. He left those Old FMI shares to a charitable trust created under the terms of his will. The trust could not prudently keep all of its assets in one investment and therefore had to sell the stock. Defendant Jerome Kohlberg, of Kohlberg, Kravis and Roberts (KKR), a New York investment firm that specialized in leveraged corporate buyouts, had been following Old FMI for over twenty years and saw an opportunity from this situation. Kohlberg

did not simply want to buy the trust's shares. Rather, his goal was to arrange a purchase of the entire corporation and thereby to take the company private. As was KKR's practice with buyouts that it arranged, it wanted Old FMI's management to participate in the purchase and to continue to operate the company after its completion. In this case, KKR had to overcome considerable management resistance before it achieved its goal.

In September, 1980, KKR offered to purchase Old FMI for $45 per share. The Old FMI board, meeting soon afterwards, rejected the offer, partly because it believed it to be inadequate and partly because of its concern about the effect that the debt necessary for a leveraged buyout would have on the company's growth. Kohlberg thereafter worked in a number of ways to develop both a new proposal and a more receptive environment.[7] One important factor would be to increase the price that KKR could offer. The RECs became crucial to KKR's resolution of that problem.

Because the leases between Old FMI and the RECs were designed primarily to cover the loans on the various properties, most of them had no escalator or percentage rent provisions. As a result, long before 1981 the lease rentals had fallen far below market rates. One of the most attractive features of Old FMI from KKR's viewpoint was the large number of these "beneficial leases," including some with independent landlords and Old Properties as well as those with the RECs. Because most of the leases had clauses providing that the landlord could not unreasonably withhold consent to an assignment, KKR considered them to be an asset of Old FMI rather than of the landlords. In order to improve its offer, KKR had to find some method to take the value locked up in those leases and make it available for investors. The method that defendant George Roberts, another KKR partner, developed is the heart of the major disputes in this case.

Simply put, KKR proposed that Old FMI, including Old Properties, its subsidiary, would be dissolved and that its

---

[7] The situation created by Meyer's death had led to a number of disputes, including other litigation. The personal representatives of Meyer's estate, all of whom were also members of the Old FMI board at the time of the original offer, had divided into two camps. To at least some of those involved, KKR's offers seemed to provide a solution to those problems.

assets would be distributed to two new entities.[8] Fred Meyer, Inc., a Delaware corporation (New FMI), would receive the operating assets and would actually operate the business. Fred Meyer Real Estate Properties, Ltd., an Oregon limited partnership (New Properties), would receive the real estate assets. Those assets included assignments of the lessee's interests in the existing stores. New Properties would sublease those stores to New FMI at increased rents, but no more than the current market rates. Those increased rents, which the parties call the "upcharge," would go entirely to New Properties, which would distribute almost all of the upcharge to its partners. The RECs would not receive any part of the upcharge.

The financing of the buyout required that the total upcharge be $34 million for all of the properties that Old FMI leased, including those leased from the RECs, from independent landlords and from Old Properties. Old FMI's rentals had totalled $7 million; New FMI would thus pay New Properties $41 million to rent the same locations.[9] New FMI would also be able to write up its inventory as a result of the buyout. Each of those changes would reduce New FMI's taxable income. The partners in New Properties would receive essentially all of the upcharge in distributions and would be able to claim a form of depreciation as an offset to that income. In this way the proposal would "unlock" the value in the beneficial leases for the profit of the investors at the expense of the federal and state governments.

Under the KKR proposal, limited partnerships would own most of the shares in New FMI and would be the general partner in New Properties; KKR would control the general partner in each of the controlling limited partnerships. Nine top ranking executives of Old FMI would be among the limited partners in New Properties and the only non-KKR shareholders in New FMI. Various large institutional investors would be limited partners in the partnerships and would provide the great majority of the financing. In June, 1981, KKR offered to purchase Old FMI under this structure for $55 per

---

[8] Throughout this opinion, we refer to the purchasing entities by the names that they adopted after the buyout closed, rather than by those that they used before then.

[9] The actual allocation of the upcharge to the various properties occurred after the closing. The upcharge on the REC-owned properties is disputed. The minimum figure for the first year is close to $7 million; it may have been considerably more.

share. The total proposed investment, including $7 million in expenses and fees, was $420 million.

The Old FMI board appointed a committee of disinterested directors to examine the KKR proposal and to explore other possible sales. The committee recommended in favor of the KKR proposal, and on August 25, 1981, the board voted to accept it. The parties signed the formal Asset Purchase Agreement, the basic document of the buyout, on September 25, 1981. After considerable further work on the details, the preparation of the necessary SEC filings and disclosure statements, and a favorable shareholder vote, the transaction closed on December 11, 1981.

All of the leases between Old FMI and the RECs had provisions requiring the landlord's consent to any assignment. Except for the leases of the Clackamas and Gresham stores and of the Hazel Dell Home Improvement Center, they also provided that the landlord would not unreasonably withhold its consent. It was essential to the buyout that the RECs and the other landlords consent to the assignments of Old FMI's lessee's interests to New Properties. Section 4.5 of the Asset Purchase Agreement required Old FMI to use its best efforts to obtain all necessary consents other than those that would not, in the aggregate, have a material adverse effect on the transaction.

The purchase and financing agreements contained two provisions that interpreted the general requirement of Section 4.5 in ways relevant to this litigation. Section 5.2(d) of the Asset Purchase Agreement (the "excused consents provision") provided that New Properties was required to close the transaction even if Old FMI did not provide pre-closing consents for two named stores and for additional stores that, in the aggregate, contributed up to 7-1/2 percent of Old FMI's total operating profit. Old FMI remained responsible for ultimately obtaining those consents. The purpose of the exception was to allow closing even if there were no consents for the stores leased from the Chiles-controlled RECs and from the REC whose control was equally divided between Old FMI and Chiles.

Section 3.10 of the subscription agreement between New Properties and its Class A limited partners (the

"$4,000,000 provision") required the limited partners to provide the financing that they had promised so long as New Properties did not approve "increases in amounts payable under mortgages, deeds of trust, instruments or contracts of Fred Meyer or its subsidiaries amounting to more than $4,000,000 in any year * * *." The other financing documents had similar language. The primary purpose of the provision was to allow Old FMI and its landlords room to negotiate with lenders, who also had to consent to the assignments. The RECs' loans were at rates well below those current in the market in 1981, and lenders whose loan agreements contained due on sale clauses might seek to increase the interest rates to something closer to the market rates. The language of the provision would also permit the payment of increased rentals to a landlord, including an REC, in order to obtain its consent.

The parties refer to these two provisions as the "leeway provisions," because, according to plaintiffs, they provided Old FMI with leeway within which it could improve the RECs' position as a result of the buyout. Defendants in fact did not try to use them for that purpose. Instead, Old FMI and the Old FMI officers who controlled the RECs' boards took the position that their obligations under the Asset Purchase Agreement required them to vote to consent to the assignments. They also believed that the reasonableness clauses in most of the leases gave them no legal basis for refusing to consent.

On December 2, 1981, the Old FMI board decided to vote its shares in the RECs in favor of giving the consents. There was no discussion, at that or any other board meeting, of whether Old FMI as the majority shareholder or the Old FMI officers who constituted the majority of the REC boards might owe any fiduciary duties to Chiles. On December 9, 1981, a majority of the shareholders of the five RECs that Old FMI controlled authorized consenting.[10] Defendant Robertson, as president of the equally owned REC, granted consent on its behalf. He based his authority for doing so on a provision in its bylaws that permitted the president to act

---

[10] Some of the leases included provisions that might have required that Old FMI remain liable after any assignment. When necessary, the consents included a consent to Old FMI's dissolution.

when the shareholders were deadlocked.[11] The RECs received no consideration for those actions. Various lenders, including some who lent to non-REC landlords, received modifications totalling less than $500,000 in annual interest increases and something over $100,000 in one-time fees. There were also some accelerations of loan maturity dates. Those involved in obtaining the consents believed that to be an excellent result.

Chiles and Earle M. Chiles, who were both members of the Old FMI board, generally opposed the KKR offers. They believed that the offers were too low and were also concerned about what would happen to the RECs. Although they assumed that the RECs would be liquidated and that New Properties would receive Old FMI's share of the stores, they could get no clear information. It appeared to them and to their counsel that they had an unavoidable conflict of interest between their fiduciary responsibilities as directors of Old FMI and their personal interest in getting the best deal possible for the RECs. After what they considered to be an unproductive meeting with Kohlberg on the morning of August 25, 1981, they resigned from the Old FMI board in order to avoid that conflict. They were, thus, not present or entitled to be present at the meeting at which the board approved the KKR offer.

As a consequence of leaving the board, Chiles and his son did not receive the information about the transaction that directors of Old FMI received, but only that sent to shareholders or to landlords. They did not learn until the end of November that the plan called for the REC leases to be assigned and for the companies not to be liquidated. On December 5, their attorney wrote to those involved in the buyout, stating Chiles' position that the proposed actions would violate Old FMI's fiduciary duty as the controlling shareholder of the RECs and the fiduciary duties of the Old FMI officers who sat on the REC boards. The attorney did not threaten to hold up the buyout but indicated that Chiles would seek redress afterwards. The buyout then closed on schedule.

---

[11] The Chiles-controlled RECs consented with respect to one store that lost money and for which it was unrealistic to expect any concessions in return for the consent and for two other stores whose leases were due to expire soon after the buyout. The refusal of Southeast Company to give consent for its store is the subject of *Fred Meyer, Inc., v. Southeast Company,* the second case in this appeal.

Chiles died in December, 1982, with the issues unresolved. Plaintiffs filed *Chiles v. Robertson* in September, 1983, as both a direct shareholder's action and a derivative action on behalf of the corporations. They raised a number of claims on behalf of the RECs relating to alleged improprieties in granting consents to the assignments of the leases and relating to a number of other more minor matters. In response to that lawsuit, and at defendants' behest, the RECs expanded their boards to add a number of disinterested directors and then appointed those directors to a Special Litigation Committee (SLC) to determine whether the RECs should pursue the derivative claims. The SLC held a number of hearings. In April, 1984, it found that some of plaintiffs' claims were partially well-founded and recommended corrective action. It did not find anything wrong with the RECs' actions in consenting to the assignments. The SLC recommended that the companies not pursue the derivative case after they made the corrections that it suggested. The RECs accepted the SLC's recommendations and took the actions that it proposed. However, in July, 1984, the trial court held that not all of the SLC's members met the legal standards of disinterestedness and refused to dismiss the derivative claims, even if it would have done so otherwise. *See Zapata Corp. v. Maldonado,* 430 A2d 779 (Del 1981). Defendants do not challenge that action in their cross-appeal.

## CHILES v. ROBERTSON: LAW

The parties' legal arguments are like two ships that pass in the twilight: Each is vaguely aware of the other's presence, but neither actually reacts to the other. Plaintiffs emphasize defendants' fiduciary duties as the majority shareholder and directors of the RECs but refuse to recognize that the lessee's interests in the stores were one of Old FMI's major assets because of their below market rents. Defendants emphasize Old FMI's ownership of those interests under real property law but refuse to recognize the extent to which their fiduciary duties modified their ability to rely on their ownership rights.

Unlike the parties, we cannot ignore either argument, because each side has hold of part of the elephant. To understand the entire animal, we must explore the relationship between Old FMI's rights under the leases and the duties that

it and its officers owed to the RECs and to plaintiffs. Defendants faced inherent conflicts between their duties and their individual interests, conflicts that they did not recognize and that, therefore, they did not attempt to resolve. We will first discuss defendants' duties as the majority shareholder and directors of the RECs. We will then describe how those duties affected the actions defendants took or should have taken during the buyout negotiations.

■  The majority shareholder of a close corporation owes the minority fiduciary duties of loyalty, good faith, fair dealing and full disclosure. *Delaney v. Georgia-Pacific Corp.,* 278 Or 305, 310-311, 564 P2d 277 (1977); *Baker v. Commercial Body Builders,* 264 Or 614, 629, 507 P2d 387 (1973); *see also* 12B Fletcher, *Cyclopedia Corporations* § 5811 (perm ed 1984). Directors and senior executive officers of all corporations owe similar duties to the corporation. *Klinicki v. Lundgren,* 298 Or 662, 666, 695 P2d 906 (1985); *see* 3 Fletcher, *supra,* § 838 (rev ed 1986).

Issues of whether a corporate officer or controlling shareholder has fulfilled fiduciary duties have arisen in a number of circumstances and have led to the creation of various specific rules. Courts, however, are not willing to say that a fiduciary fulfills its duties simply by following those rules. Opinions pile phrase upon phrase in what appears to some observers to be a mere compilation of platitudes. *See Klinicki v. Lundgren, supra,* 298 Or at 668. Yet those platitudes express something deeper; they are a judicial attempt to emphasize that the heart of a corporate fiduciary's duty is an attitude, not a rule. The fiduciary best fulfills its duties if it approaches them with the attitude of seeking the beneficiary's interests rather than the personal interests of the fiduciary, not if it simply tries to follow rules codified from past decisions. Judge Cardozo expressed that attitude more than sixty years ago, in language that the Oregon Supreme Court quoted more recently:

> "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A [fiduciary] is held to something stricter than the morals of the market place. Not honesty alone, but *the punctilio of an honor the most sensitive,* is then the standard of behavior. * * * Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the

rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions * * * Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd." *Meinhard v. Salmon,* 249 NY 458, 464, 194 NE 545 (1928), *quoted in Klinicki v. Lundgren, supra,* 298 Or at 684. (Emphasis supplied.)

Our primary focus in this opinion is necessarily on the specific rules that courts have created in the process of applying the implications of the fiduciary attitude to a variety of specific situations. No rule, however, can substitute for the "punctilio of an honor the most sensitive." That is an internal, not an external, standard. A fiduciary who follows it will fulfill its obligations without needing to worry about detailed rules; it is the ultimate criterion for evaluating defendants' actions in this case.[12]

The American Law Institute has tentatively codified many of the specific rules for corporate fiduciaries in several drafts of its *Principles of Corporate Governance (Corporate Governance).* In *Klinicki v. Lundgren, supra,* 298 Or at 677-683, the Supreme Court found a tentative draft of *Corporate Governance* to be helpful in resolving a case involving the taking of a corporate opportunity. The parties in this case rely on other provisions in later tentative drafts. We agree with them that majority shareholders and corporate directors who do not comply with the provisions that we quote below violate their fiduciary duties. We do not necessarily hold that those rules fully state all of the requirements that flow from acting with a fiduciary attitude.

Section 5.04[13] provides that a director or senior executive

"may not advance his pecuniary interest by using his corporate position * * * in a manner that:

---

[12] Before the buyout closed on December 11, 1981, the KKR defendants, New Properties and New FMI had no relationship to the RECs. Despite plaintiffs' arguments, we find no other basis for holding them directly liable for whatever wrongs may have been done up to that time. Our discussion of defendants' duties, and any references to "defendants" before that time, therefore, do not include those defendants. New Properties and New FMI would be liable on any judgment for events that occurred before the buyout only because they assumed Old FMI's liabilities as part of the transaction.

[13] Unless this opinion states otherwise, references to *Corporate Governance* are to Tentative Draft No. 5 (1986).

"(1)   causes reasonably foreseeable harm to the corporation or any of its shareholders in their capacity as shareholders; or

"(2)   allows him to secure a pecuniary benefit [except in circumstances not relevant here]."

Section 5.11 provides that a dominating shareholder

"may not advance his pecuniary interest by using his dominating position * * * in a manner that:

"(1)   causes reasonably foreseeable harm to the corporation or to its other shareholders in their capacity as shareholders; or

"(2)   allows him to secure a pecuniary benefit [except in circumstances not relevant here]."

Finally, § 5.10 provides that a dominating shareholder

"who enters into a transaction with the corporation fulfills his duty of loyalty to the corporation concerning the transaction if:

"(1)   the transaction is fair to the corporation when entered into; or

"(2)   the transaction is authorized or ratified by disinterested shareholders [under circumstances not relevant here]."

Those rules become meaningful only when they are applied to specific situations. Three cases provide examples of how courts have acted. In *Delaney v. Georgia-Pacific Corp., supra,* the plaintiffs and the defendants formed a joint venture, which they later incorporated. Each group had a half interest in the enterprise and was entitled to choose half of the members of the board of directors and half of the corporate officers. The defendants, however, used their greater economic power and their control over crucial corporate offices to manipulate the corporation's finances, to conceal important information about negotiations from the plaintiffs and ultimately to expel the plaintiffs from any role in managing the business. The Supreme Court held that, by doing so, the defendants violated their fiduciary duties to the plaintiffs. In essence, they had been loyal to themselves rather than to the corporation or to the other shareholders. As a remedy for the defendants' misconduct, the court required them to purchase the plaintiffs' interests at a price that reflected a return to the corporation of what it had lost through their actions.

*Delaney* is a relatively routine example of how directors, senior executives and a dominating shareholder may use their corporate positions to further their own interests in ways that *Corporate Governance,* §§ 5.04 and 5.11, would prohibit. The defendants' actions damaged both the corporation as an entity and the individual interests of the plaintiffs as shareholders. By its choice of remedy, the Supreme Court required them to make good the losses that the minority had suffered.

*Jones v. H. F. Ahmanson & Co.,* 1 Cal 3d 93, 460 P2d 464, 81 Cal Rptr 592 (1969), represents a more sophisticated use of corporate control to benefit the majority at the expense of the minority. The defendants owned the majority of the shares of a savings and loan association. Because of the high price of the shares and the resulting limited market for them, the majority was unable to take advantage of a bull market in savings and loans stocks. The defendants could have created a market for their shares by a stock split, thereby reducing the price of each share to a level that the market could handle. That action would have allowed the minority to share proportionately in the bull market, but it would have threatened the majority's control of the association. Instead, the majority shareholders organized a holding company and transferred their shares to it, receiving 250 holding company shares for each association share. The minority had no opportunity to participate in the holding company. As a result of that transaction, the majority transformed its association shares into readily-marketable holding company shares, allowing the majority to profit by selling many of them without giving up control of the association. Minority shareholders found that the limited but genuine market that had previously existed had disappeared. They now could sell their shares only to the holding company, whose offering price was below book value, which itself was far less than the market price of 250 holding company shares.

The California Supreme Court held that the majority shareholders violated their fiduciary duty to the minority by that transaction, even though they did not change the formal ownership of the association or the nature of its business. The court's reasoning is applicable to this case:

> "Majority shareholders may not use their power to control corporate activities to benefit themselves alone or in a manner

detrimental to the minority. *Any use to which they put the corporation or their power to control the corporation must benefit all shareholders proportionately* and must not conflict with the proper conduct of the corporation's business." 1 Cal 3d at 108. (Emphasis supplied.)

The court emphasized that the majority's responsibility went well beyond following statutory duties and avoiding outright fraud: "[T]he comprehensive rule of good faith and inherent fairness to the minority in any transaction where control of the corporation is material properly governs controlling shareholders in this state." 1 Cal 3d at 112. The court held that, under the facts that the plaintiffs alleged in their pleadings, the defendants had used their control of the association to obtain an advantage not made available to all shareholders and that they did so without regard to the accompanying detriment to the minority and without any compelling business interest. That action violated the majority's duty of good faith and inherent fairness to the minority.[14] 1 Cal 3d at 114. The majority's failure was in attempting to manipulate the rules to its benefit instead of acting from a fiduciary attitude.

*Delaney v. Georgia-Pacific Corp. supra,* and *Jones v. H. F. Ahmanson & Co., supra,* are examples of how dominating shareholders may violate their duties to the minority. The case whose facts are closest to this one, however, is *Weinberger v. UOP, Inc.,* 457 A2d 701 (Del 1983). *Weinberger* was an action by a former minority shareholder of UOP, Inc. (UOP), against Signal Companies, Inc. (Signal), the majority shareholder. The plaintiff sought damages that he and other minority shareholders allegedly suffered as the result of Signal's purchase of all of the outstanding UOP shares.

Before Signal's purchase of the minority's shares, it owned 50.5% of UOP. Signal had large cash reserves that made it an attractive target for a hostile takeover. It wanted to reduce its reserves and decided that the best way to do so was to purchase the remaining UOP shares. Two Signal officers, who were also UOP directors, studied the proposed purchase

---

[14] The court decided the case on a motion against the plaintiffs' complaint and therefore assumed that the facts that the plaintiffs had pleaded were true. It noted that the defendants could still allege and prove good faith or a compelling business purpose that would render their actions fair under the circumstances. *Jones v. H. F. Ahmanson & Co., supra,* 1 Cal 3d at 114.

and concluded that any price up to $24 per share would be a good investment for Signal. Despite their positions on the UOP board, they did not inform other UOP board members or UOP shareholders of this conclusion; instead, Signal offered to purchase the outstanding UOP shares for $21. The UOP board and its shareholders approved a sale at that price, and Signal then completed the purchase.

The Delaware Supreme Court held that Signal had breached its fiduciary duties to the minority UOP shareholders. The factors that the court emphasized included Signal's initiation of the purchase, its pressure for a quick decision, the limited negotiations over price and the failure to disclose the conclusion that a price of $24 would be fair to Signal. That failure was especially important, because the Signal officers involved failed to recognize their duties as directors of UOP. They neither sought entire fairness for both companies nor abstained from any involvement. Rather, they worked exclusively for Signal's interests. The court emphasized that, for the transaction to be fair, Signal must both have dealt fairly with the UOP minority and also have given a fair price. A favorable outcome did not by itself show compliance with Signal's duties to the minority. Signal had clearly dealt unfairly, and there was no evidence that the price was fair. The minority shareholders' vote to accept the $21 offer was meaningless, because Signal had kept them unaware of its conclusion concerning the $24 price. The court remanded the case for an appraisal of UOP as of the time of the sale and for the award of damages if the appraisal determined that the $21 price was not fair.

These cases show that fairness to the minority requires more than simply a price that is within the range of fair results; the majority must also recognize the minority's interests and ensure that the procedures that it follows are fair. Defendants appear to equate arms' length equivalence with fairness, but that is neither sufficient nor does it reflect the fiduciary attitude of loyalty to the corporation and to the minority. Arms' length negotiations can produce a range of results. The point of these cases, and of *Weinberger v. UOP, supra,* in particular, is that the majority must attempt to obtain the maximum legitimately available for the corporation and the minority from the transaction, not simply what

an outsider would be able to obtain in an arms' length negotiation.

Signal, if it had previously had no connection with UOP, might well have been able to negotiate an arms' length agreement to purchase it for $21 per share. However, because it was the majority shareholder, it had to ensure that the price it paid reflected *all* relevant factors, including that Signal would get a good deal at $24 per share. It did not matter that Signal would not have had to disclose that information to an arms' length purchaser; by its failure to use it in setting its offering price and by failing to disclose it to the minority, Signal violated its duty to make the transaction procedurally fair. As a remedy for that breach of duty, it had to pay what procedural fairness would have produced: the actual fair value of the minority's shares, that is, the maximum price within the range of fairness.[15]

We turn now to the issues in this case. Plaintiffs' argument, in brief, is that the individual defendants who were directors of the RECs used their positions to secure pecuniary benefits for themselves and for Old FMI at the expense of the RECs. They did so, plaintiffs assert, by requiring the RECs to give the consents without consideration and by failing to structure the buyout so that some or all of the upcharge would come to the RECs rather than to New Properties. Plaintiffs also argue that Old FMI, the dominating shareholder, required the RECs to give the consents for no consideration when it was not fair to them to do so and when Old FMI would receive a pecuniary benefit from the action.[16]

KKR, not defendants, was the primary architect of the structure of the buyout, and defendants had little ability to affect KKR's decisions in that respect. Despite plaintiffs' valiant attempts to find some basis for holding otherwise, KKR had no fiduciary obligations to the RECs before the buyout closed. *See* note 12, *supra.* Because of the complexity of the

---

[15] Signal did not, however, have to give the minority *more* than the maximum that total fairness would have produced. It did not, for instance, have to pay the additional $3 per share without regard to the actual fair value of the UOP shares.

[16] Plaintiffs in fact make a considerably broader argument, the upshot of which is that defendants must "disgorge" all of the gain that they received from the assignments of the REC leases. That argument is not persuasive. *See* note 15, *supra.* We focus instead on the strongest portions of plaintiffs' position.

arrangements, and because of the various considerations that KKR had to balance, defendants' failure to seek significant structural changes in order to benefit the RECs did not breach their fiduciary duties.

Plaintiffs are correct, however, that defendants failed even to attempt to take advantage of the opportunities that the structure that KKR created *did* provide to improve the RECs' position. Defendants knew of the $4,000,000 provision, but they neither told Chiles about it nor attempted to use it to obtain a benefit for the RECs. It is at this point that *Weinberger v. UOP, supra,* is directly relevant.

In *Weinberger,* as in this case, the loyalties of the directors of the subsidiary were in conflict, there was an undisclosed potential fund for additional payments to the minority, and those directors who were related to the majority shareholder, and the shareholder itself, failed to consider the interests of the minority, both in the use of the fund and in the other aspects of the purchase. The Old FMI directors and employes who sat on the REC boards were personally interested in seeing that the sale to KKR went through and that the cost of obtaining the consents was as low as possible. They had ownership interests in the acquiring entities, and they also had duties as directors and officers of Old FMI to see that it fulfilled its contractual obligation to use its best efforts to procure the consents. Those personal interests and duties conflicted with their duties as directors of the REC boards and as those in control of the majority shareholder to get the best possible terms in return for the consents. They resolved all conflicts, to the degree that they even recognized their existence, against the RECs.

The RECs actually gave their consents by shareholder vote, not by decision of their boards. Thus, technically, the only relevant duties are those that Old FMI owed as the controlling shareholder. That technical point, however, is of little significance. Although the court in *Weinberger v. UOP, supra,* focussed on the duties that the directors of UOP owed to UOP, the remedy that it awarded was against Signal. In essence, the court recognized that Signal's employes *were* Signal, at least for the purposes of the stock purchase, and that their failure was Signal's failure.

In the same way, the Old FMI directors and officers

who sat on the REC boards were among those who instructed Old FMI to vote its shares in the RECs in favor of the consents. Defendant Robertson, the chair of the Old FMI board, wrote to himself as president of the RECs, seeking their consents. He personally gave consent for the REC whose stock was equally owned, basing his authority for doing so on the power that the bylaws gave him in case of shareholder deadlock. Distinctions between the duties of directors and the duties of controlling shareholders are simply irrelevant, because Old FMI was, for all practical purposes, in both positions. Either status required defendants to comply with the fiduciary duties of loyalty, fair dealing and full disclosure in completing the transaction. The real question is whether, by ignoring the $4,000,000 provision, and by not making the slightest effort to bargain for concessions in return for the consents, defendants breached those duties.

Under the $4,000,000 provision, the institutions providing the financing could not withdraw from their commitments even if Old FMI and KKR made concessions to lenders and landlords as great as $4,000,000 per year in order to obtain their consents. The provision did not require *KKR* to continue with the buyout under those circumstances, and defendant Roberts testified that KKR would not have done so if it had been necessary to use the full $4,000,000. Even if that testimony correctly states what KKR would have done at the time, the existence of the provision in itself created considerable negotiating room that defendants could have attempted to use to benefit the RECs. Defendants, however, did not even consider the possibility of doing so.[17] They assert that this failure was not a breach of fiduciary duty, because the RECs had no legal basis for refusing to give the consents.

Plaintiffs respond that whether the RECs had a legal basis for refusing consent in an arms' length transaction is irrelevant to defendants' fiduciary duties. Those duties in themselves, plaintiffs argue, required defendants to shift a proportionate part of the upcharge to the RECs without

---

[17] Defendants did recognize the existence of Chiles' claims in a few contexts, such as the opinion letters that two law firms delivered at the closing. However, those paper recognitions functioned primarily to allocate liability among those involved in the buyout in case Chiles was successful. They had no relationship to how defendants acted during the buyout.

regard to the RECs' rights under the leases. Plaintiffs' argument is based on a misunderstanding of defendants' obligations. Fiduciary duties cannot require the perpetration of highway robbery, nor can they require the fiduciary to make a gift to the beneficiary. As the Delaware court indicated by the remedy that it provided in *Weinberger v. UOP, supra,* a breach of a corporate fiduciary duty simply allows the minority to get the most that it could have obtained in the absence of the breach. It does not guarantee the minority a windfall.

Thus, in order for defendants to have had a duty to seek some of the upcharge for the RECs, the RECs had to have a legal basis for claiming some of the upcharge for themselves. That basis could be a colorable claim that the RECs had a legal right to refuse to consent to the assignments or to insist on concessions in return for consenting. Only then would there be anything that a fiduciary could legitimately do on their behalf.[18] If the RECs had a colorable claim, they could have bargained for concessions in return for their consents.[19] Because defendants had a duty to further the interests of the RECs without regard to their own interests, other than their interests as shareholders of the RECs, they would have had to assert that position in response to the requests for consents. On the other hand, if the RECs had no reasonable ground for arguing that they had a right to withhold consent, they had a contractual duty to consent. Fiduciary loyalty does not require a corporate fiduciary to seek to extract money to which the corporation has no legally justifiable claim. We therefore turn to the rights that the RECs had under the leases with Old FMI.

For the purposes of these cases, the leases between

---

[18] Contrary to defendants' arguments, plaintiffs do not have to show that the RECs had an indisputable right to refuse consent. Parties in arms' length transactions do not make demands only when their position is indisputably correct, nor do they make concessions only when they are certain that they would lose if the issue went to court. The existence of a colorable claim is sufficient to justify either the assertion or the settlement of that claim. It is therefore sufficient to raise the possibility that defendants had a fiduciary duty to assert the RECs' claims to some of the upcharge.

[19] Of course, what the RECs could expect in return for their consents to the assignments would depend in part on the strength of their legal positions. A negotiator in a weak position will usually achieve less than one acting from a position of strength. Defendants do not, however, claim that they negotiated with KKR in good faith and were unable to obtain anything because their position was too weak; rather, they failed to make any effort to negotiate at all.

the RECs and Old FMI fall into two categories. Most either prohibit an assignment without the previous written consent of the lessor, "which consent Lessor agrees not unreasonably to withhold" (Gateway) or provide that "Lessor shall not unreasonably withhold its consent to any assignment to any responsible and reputable person, firm or organization" (Peninsula and Tigard). The parties assume that the RECs' rights and obligations were the same under both of those "reasonableness clauses." Leases with such clauses are the first category of leases. The second category consists of the Clackamas and Gresham stores and the Hazel Dell Home Improvement Center, whose leases prohibit an assignment without the lessor's consent but do not specify that that consent will not be unreasonably withheld.[20]

We will consider, with respect to each category of lease, whether the RECs had a legitimate argument that they could either withhold consent or demand concessions such as increased rent in return for consenting. We do not need to decide at this point whether the RECs would have ultimately been successful in a legal action, but only whether they had a realistic negotiating position. If they did, a fiduciary who placed the RECs' interests ahead of its own would have negotiated.

We will first consider the RECs' rights in the second category of leases, those without reasonableness clauses, because the analysis is simpler. In *Abrahamson v. Brett,* 143 Or 14, 22, 21 P2d 229 (1933), the Supreme Court stated that where "a subletting or assignment of the leased premises without the consent of the lessor is prohibited, he may arbitrarily withhold his assent without giving any reasons, and in granting his assent may impose such conditions as he sees fit." Defendants point out that this statement is *dictum,* and they assert that it is contrary to recent decisions in other states that hold that a requirement that the landlord act reasonably

---

[20] It appears that the person in the Old FMI office who typed the Gresham and Clackamas leases simply used a form that did not contain a reasonableness clause and that Old FMI officers signed the leases on behalf of both Old FMI and the affected REC without noticing the omission. That is another example of the informality in the relationships between the corporations while Meyer was in control, an informality that his successors continued without fully considering the implications of their actions. We discuss additional complexities in the Gresham and Clackamas leases below.

when deciding whether to consent to an assignment is implicit in a commercial lease. *See, e.g., Kendall v. Ernest Pestana, Inc.,* 40 Cal 3d 488, 709 P2d 837, 220 Cal Rptr 818 (1985). A lawyer who is an expert in real property law testified on defendants' behalf that the Oregon Supreme Court might have reached a similar conclusion in 1981. Defendants argue, based on these and other authorities, that the trial court should have held that a reasonableness condition was implicit in the leases.

Defendants' argument misses the point. The question is not what a court would hold when the issue came before it but what was a reasonable position to take in 1981. *Abrahamson v. Brett, supra,* had been decided many years earlier, and the Supreme Court had not questioned the correctness of the statement in question. The majority of American courts still adhere to the rule stated in *Abrahamson. See Annot.,* 21 ALR 4th 188 (1983).[21] *Abrahamson* gave the RECs a strong position in any bargaining that might have occurred over consents for these leases. A lessee seeking a lessor's consent to an assignment of a lease that did not contain a reasonableness clause would have faced a significant risk that the lessor could make its arbitrary refusal to consent stand up in court. At the least, the lessee would be buying a lawsuit whose outcome was uncertain. A reasonable lessee would therefore have been willing to give the lessor concessions in return for the consent, particularly where the assignment of the lease was a crucial part of a major transaction.[22]

The more difficult question is whether there was a legal basis for the RECs to seek concessions on leases that contained a reasonableness clause. An unreasonable refusal to

---

[21] Although this annotation was published after 1981, the cases that it discusses were generally decided before that year. In other portions of this opinion we discuss cases that were decided after 1981, because those cases appear to reflect either what the law was in that year or the direction in which the law was moving. In either event, they set forth principles that a lawyer considering the situation in 1981 should have taken into account.

[22] Defendants' arguments, and the way in which defendants framed the evidence that they presented at trial, generally assume that the only choice that the REC had, other than to give outright consent to the assignments, was to terminate the leases. That assumption ignores the nature of negotiations; termination was an ultimate weapon, which *both* sides would undoubtedly have sought to avoid. Any difficulties that termination might have caused for the RECs would simply have weakened their negotiating position. They were not an excuse for failing to negotiate at all.

consent could subject the RECs to claims for damages; if the result had been the failure of the buyout—which, although unlikely, was not impossible—the damages could have been enormous. *See Collis v. Baker,* 285 Or 417, 591 P2d 363 (1979). The criteria by which a court would judge the reasonableness of the lessor's action, therefore, would have been an important consideration for the RECs in deciding what to do. No Oregon cases, however, discuss what those criteria are. We therefore turn to that subject.

In determining what it was reasonable for them to do, the RECs had to consider the implied covenant of good faith that the leases, like all contracts, contained. That covenant required them to act in ways that would further the purposes that the parties sought to achieve when they agreed to the reasonableness clauses. *See Best v. U.S. National Bank,* 303 Or 557, 561, 739 P2d 554 (1987); *Perkins v. Standard Oil Co.,* 235 Or 7, 16, 383 P2d 107, 383 P2d 1002 (1963).[23] Whether the RECs needed to have only a subjective good faith belief that it was proper to deny the consents or whether they also had to show by objective criteria that it was commercially reasonable for them to do so is unclear. *See Comment,* "The Approval Clause in a Lease: Toward a Standard of Reasonableness," 17 USFL Rev 681, 694-696 (1983). In either case, a simple desire to improve their position would not be a reasonable ground for the RECs to refuse consent. They had at least to have a legitimate basis for believing that they would be in a worse position after the assignment than before.[24]

Cases from other states that have considered the factors that a landlord may take into account in deciding whether

---

[23] Because of the close relationships between the RECs and Old FMI at the time that they entered into the leases, of course, to speak of the "purpose of the parties" has an artificial flavor. The best we can say is that, to the degree that they had a purpose independent of furthering Old FMI's interests, the RECs sought stable relationships with a financially solid tenant in order to ensure rentals sufficient to cover the RECs' obligations and to avoid the foreclosure of their properties.

[24] Although the RECs could not treat the request for assignments simply as an opportunity to force an increase in rents, they might legitimately have believed that a consent without an increase would put them in a worse position than before the consent but that an increase in rent would compensate for the increased risk. In that case, they could insist on concessions from New Properties as a condition for the consents. *See John Hogan Enterprises, Inc. v. Kellogg,* 187 Cal App 3d 589, 594, 231 Cal Rptr 711 (1986).

to grant consent have emphasized that the primary consideration must be the new lessee's financial responsibility. Other factors that courts discuss generally relate to the use that the assignee proposes to make of the property. *See, e.g., Kendall v. Ernest Pestana, Inc., supra,* 40 Cal 3d at 501. In this case, of course, New Properties intended to use the property in the same way that Old FMI had. Courts also recognize that a lessor that has reasonable commercial objections to a proposed assignee may properly negotiate for a new lease or the payment of a premium if the lessor would otherwise be justified in an outright refusal. *See* note 24, *supra.*

Much of the evidence concerns whether it would have been commercially reasonable for the RECs to refuse to consent to the assignments. Plaintiffs point to a number of factors in support of their argument that it would have been reasonable to do so. There is at least some support in the record for these points: 1) The assignments would be to a limited partnership that was structured to distribute its entire current cash flow and that would thereby have depleted its assets well before many of the leases expired. 2) None of the partners would have personal liability on the leases, and the partnership would not be the operating entity. 3) The change in the lessee carried a significant risk of creating "tainted rent" under the personal holding company provisions of the Internal Revenue Code, possibly subjecting the RECs and their owners to heavy tax liability. 4) The New Properties partnership agreement severely limited the RECs' possible future activities. 5) Because Old FMI would be dissolved as part of the transaction, the original tenant would no longer exist, a change that might constitute an anticipatory repudiation of the leases. In addition to these points, an expert witness testified that, as a result of the changes that the buyout would produce, especially the new debt used to finance it, the purchasing entities would be financially riskier tenants than was Old FMI.

Defendants have effective responses to most, if not all, of plaintiffs' arguments.[25] Those arguments, however, are

---

[25] We do not consider evidence that the RECs that Chiles controlled granted consent as to some of their stores without seeking concessions, or that independent landlords generally did so, to be of very great weight. The other Chiles stores had their particular characteristics. *See* note 11, *supra.* There is no evidence that all of the

not entirely without merit, and we do not believe that a person looking at the situation before the buyout in 1981 would have found them to be unworthy of consideration. A determination of whether it was reasonable to refuse to consent necessarily involves a significant subjective component. That a landlord has obligated itself to act reasonably does not mean that there is only one possible reasonable action that the landlord may take. Reasonableness by its very nature is a range, not an absolute, and there will frequently be a number of possible actions, any one of which would be objectively reasonable. *See, e.g., Sarantis v. Sheraton Corp.,* 69 Or App 575, 578-579, 581-82, 688 P2d 99, *rev withdrawn* 298 Or 151 (1984).

If the RECs could have shown that a decision to withhold consent was within the range of reasonableness in the situation as it existed when they received the requests, keeping in mind the obligation to act in good faith, then a refusal to consent would not have violated their obligations under the leases. We conclude that, when the RECs received the requests, there were legitimate arguments that refusing consent in the absence of concessions was within the range of reasonableness. We do not conclude that refusing to consent *was* reasonable, only that a competent lawyer could properly have argued that it was.[26] That is enough to give the RECs a negotiating position and to entitle them to seek concessions that they would consider sufficient to make their consents reasonable. The risk that a court might conclude that refusal was unreasonable is simply one of the considerations in determining how strong the RECs' position would have been.

Defendants raise a number of issues in response to plaintiffs' assignments on appeal and in their own assignments of error on cross-appeal. Many of those issues require

---

independent landlords had rents that were significantly below market rates and, in any event, defendants had no duty to tell them of the $4,000,000 provision or otherwise to protect their interests. That a particular landlord finds it to be in its interest to take a particular action has little weight in determining whether it is reasonable for a different landlord in a different situation to take a different action. The issue is what is reasonable, not what is absolutely correct.

[26] As we discuss later, we conclude on the merits that *one* REC *was* required to consent and that the reasonableness clause in *its* lease did not entitle it to act otherwise.

little or no discussion.[27] However, the leases for the Clackamas and Gresham stores, which are two of the three leases without reasonableness clauses, have characteristics whose result, defendants assert, is that the RECs' ability to refuse consent was either minimal or meaningless. They therefore assert on cross-appeal that the price that the trial court set for the RECs that are the landlords for those stores was excessive. Although our approach is different from the trial court's, we must consider those arguments as part of determining the strength of the RECs' bargaining positions as to those stores.

Gresham and Clackamas were the last stores to be developed under Meyer's original system. By the time Old FMI built them, it had begun using Old Properties rather than the RECs as its land development subsidiary. However, two different RECs had purchased the land for those stores some years before the change in policy. Old FMI therefore retained those RECs as the ground landlords, but the RECs leased their land to Old Properties, rather than to Old FMI directly. Old Properties then subleased to Old FMI and borrowed the money to build the stores. As part of the financing arrangement, the RECs subordinated their fee interests to the mortgages between Old Properties and the lender. Although the leases between the RECs and Old Properties did not contain reasonableness clauses, the subleases between Old Properties and Old FMI did. In addition, the REC that owned the Gresham land agreed that, if it terminated its lease with Old Properties, it would simply succeed to Old Properties' position under the sublease with Old FMI.

Under the structure of the buyout, New Properties first received 80 percent of the shares of Old Properties, and New FMI received the rest. Old Properties was then dissolved, and New Properties received its real estate assets, including its interests in the Gresham and Clackamas leases. Old FMI assigned its interests in the subleases to New FMI. It and New Properties then amended the subleases to increase the rentals

---

[27] We do not agree with defendants that certain of the collateral assignments of leases that the RECs executed gave the lenders the right to consent on behalf of the RECs. The fact that Chiles received a large amount for his Old FMI stock as a result of the buyout does not limit plaintiffs' recovery for defendants' breach of duty, at least so long as the remedy for the breach would not have affected the closing of the buyout on the terms on which it closed.

by the amount of the upcharge. Although Old FMI, on behalf of the purchasing entities, solicited and obtained the RECs' consents to those transactions, defendants now argue that there actually was no assignment of the leases between the RECs and Old Properties and that the RECs did not, therefore, have any opportunity to refuse consent. There is no Oregon authority on point, but cases from other jurisdictions generally hold that the voluntary distribution of a lessee's interest to a shareholder of a dissolved corporate lessee violates a prohibition of assignment without the consent of the lessor. *See Annot.*, 12 ALR2d 179 (1950); 1 Friedman, *Friedman on Leases*, § 7.303c2 (2d ed 1983). We do not believe that this argument would have significantly affected the RECs' bargaining position.

Defendants also argue that, because the subleases between Old Properties and Old FMI contained reasonableness clauses, the lack of such clauses in the leases between the RECs and Old Properties did not present an opportunity for the RECs to acquire any of the upcharge. Defendants ignore that New Properties and New FMI were ultimately controlled by the same entities that intended from the beginning to increase the rents payable to New Properties under the subleases. That increased rent was basic to the buyout, and it would be in jeopardy if the RECs did not consent to the transfer of the ground leases to New Properties. The reasonableness clauses in the subleases did not, therefore, limit whatever rights the RECs had under the ground leases.

Defendants next argue that Bankers Life Company, which had lent the money for the construction of these stores and whose approval was necessary for any modification of the ground leases, would not have permitted significant changes. Defendants cite testimony from a Bankers Life officer to that effect. However, because defendants made no effort before the buyout to negotiate for more rent, it is impossible to determine exactly what would have occurred. Bankers Life certainly sought and received concessions for itself; the *post hoc* statement of one of its officers of how it would have responded to requests that defendants never actually made is of uncertain weight. We cannot know how Bankers Life would have acted, because defendants failed to seek concessions at the time; they should not now be able to use the lack of evidence that their breach of duty created to escape liability for that breach. *See*

*Stella v. Graham-Paige Motors Corporation,* 232 F2d 299, 302 (2d Cir 1956).

The other issues that defendants raise concerning the Clackamas and Gresham stores are all based on the assumption that the RECs would have asserted their right to refuse consent by terminating the ground leases. Defendants allege that various dire consequences for the RECs would have followed. Lease termination was an ultimate action that *neither* party would have wanted and that *both* would have sought, probably successfully, to avoid. To the extent that defendants have correctly described the consequences of a termination, they simply point out a weakness in the RECs' bargaining positions, not a reason for failing to bargain at all. *See* note 22, *supra.* We conclude that these considerations would have had no more than a minimal effect on the RECs' bargaining positions.

Defendants,[28] of course, did not attempt to negotiate with KKR for increased rents or other concessions for the RECs at Gresham, Clackamas or any of the other stores. Defendants, in justification of their failure to act, emphasize their obligation under the Asset Purchase Agreement to use their best efforts to obtain the consents. That contractual obligation does not excuse the breach of a fiduciary duty; at the most, it created a conflict. Defendants did not attempt to resolve that conflict; rather, they simply placed their duties under the Asset Purchase Agreement ahead of their unacknowledged duties to the RECs and to Chiles.[29]

As well as having a contractual duty to use their best efforts to obtain the consents, defendants took primary responsibility for obtaining consents from all landlords, including the RECs. In doing so, they accepted without apparent question KKR's categorization of the REC leases as an Old FMI asset. Old FMI's majority interest in the RECs was,

---

[28] The "defendants" to which we refer in this portion of the opinion are the Old FMI defendants. KKR and those associated with it had no duties to the RECs before the purchase closed and, therefore, could not have breached any duties to them. *See* note 12, *supra.*

[29] There was, in fact, no necessary conflict between defendants' duties. They could both use their best efforts to obtain the consents and also protect the RECs' interests by obtaining the consents in return for concessions to the RECs.

in defendants' view, simply an advantage in gaining the consents; it was not something that might limit the actions of Old FMI or of its officers. Despite the genuine respect that the individual defendants felt for Chiles personally, after his resignation from the Old FMI board they saw him primarily as a potential source of problems that might interfere with getting sufficient consents or that might otherwise threaten the buyout.

Because of their focus on Chiles[30] primarily as a source of problems, defendants responded to his expressed concerns in ways that they thought would reduce the danger that he might present to their goals rather than by attempting to fulfill their responsibilities to him or to the RECs. Thus, they and KKR designed the excused consents provision, *see* 94 Or App at 615, simply to give them time beyond the closing date to get consents from the RECs that Chiles controlled.[31] When Chiles, through his attorney, stated his position on December 5, 1981, defendants' primary reaction was relief that he had not threatened to stop the transaction. Although there is some evidence that some of those involved in the buyout considered doing so, defendants did not act to meet his demands. One law firm did prepare agreements, whose significance defendants dispute, that would have provided for using the $4,000,000 provision to give the RECs rent concessions. Those proposed agreements, however, never went beyond the draft stage, and it is unclear how widely they were circulated. Soon after the buyout closed, a different law firm analyzed the strength of plaintiffs' claims. Both law firms represented parties other than Old FMI, and both approached the issue with the goal of minimizing liability rather than of fulfilling a duty to plaintiffs. So far as the record reveals, neither defendants nor anyone representing them gave any significant attention before the closing to the possibility that defendants might have a duty to protect the RECs' interests or to assert their rights.

---

[30] Although plaintiffs asserted both direct and derivative claims in their pleadings, the trial court decided only the direct issues related to the consents. Because we conclude that the remedies available in a direct action are equitable as to those issues, we also will not consider those derivative claims. We therefore discuss defendants' duties to Chiles rather than to the RECs.

[31] Contrary to plaintiffs' arguments, nothing in the excused consents provision promised the RECs anything in return for the consents or excused Old FMI from ultimately procuring them. Defendants, of course, owed no fiduciary duty to the Chiles-controlled RECs, for which the excused consents provision was designed.

Defendants' failure to recognize their duties was the result, ultimately, of the years of Meyer's domination of both Old FMI and the RECs. The individual defendants had spent much of their careers watching Meyer manipulate the RECs in ways that he thought best suited his interests and Old FMI's needs and seeing Chiles either acquiesce or make generally ineffective protests. They had learned from those experiences that the RECs were the tools of their majority owner, that the minority had little to say about what happened with them and that the primary purpose of the RECs was to serve Old FMI's needs. Even the negotiations surrounding the Realty Company Proposal did not change those long-standing habits of thought. Defendants simply failed to adjust to a situation in which the interests of the minority shareholders of the RECs were no longer the same as those of the majority shareholder and in which the minority was no longer willing for the RECs to subordinate themselves to the majority's interests or to tie themselves without reservation to one company. The majority had always had fiduciary duties to the minority in theory, but those duties had never had any practical significance during Meyer's life. When those theoretical duties became actual as the result of Meyer's death and Old Properties' purchase of his shares, defendants did not adjust to the change. They did not bring a fiduciary attitude to their actions.

■       Defendants did not simply fail to act from a fiduciary attitude; they violated the specific rules that we previously described. They received a pecuniary benefit, a share of the upcharge for the successor entities in which they had personal interests, that they did not make proportionately available to other shareholders similarly situated.[32] In so doing, they violated the rules codified in *Corporate Governance,* §§ 5.04, 5.11, and the admonition of the court in *Jones v. H. F. Ahmanson,* *supra,* 1 Cal 3d at 108, that they should use their power to control the corporation in a way that would benefit all shareholders proportionately. They had an opportunity to negotiate for the RECs to get part of the upcharge in return for the consents, but they used their control over the RECs to prevent the RECs from doing so.

---

[32] Although there is a suggestion in the testimony that defendants may have considered allowing Chiles to participate in the successor entities, no one ever made him a serious offer.

The RECs had legitimate bargaining positions that defendants could have asserted, and the $4,000,000 provision provided leeway within which defendants could have acted. Instead, they, like KKR, saw the REC leases solely as a source of funding for the buyout and, thus, in part for themselves. In these respects, their actions were similar to those of the Signal employes in *Weinberger v. UOP, supra,* who, despite being directors of UOP, acted only to get the best terms for Signal. Defendants' actions did not comply with the specific rules by which courts have evaluated the duties of corporate fiduciaries, let alone exhibit the fullest sensitivity to the rights of the minority that the fiduciary attitude requires.

The trial court did not hold that defendants breached their duties because of a failure to negotiate for concessions in return for the consents. It did hold, however, that they engaged in oppressive conduct toward plaintiffs with respect to those leases that did not contain reasonableness clauses and in a number of minor matters that do not require discussion in this opinion. It might then have held, under *former* ORS 57.595(1)(a)(B),[33] that it had the authority to order the affected RECs dissolved or to impose some lesser remedy because of that oppressive conduct. In order to provide a remedy that would apply uniformly to all six RECs, however, it focussed instead on the buyout as a sale of the majority's REC shares on terms that were not made available to the minority. It analogized that situation to *Jones v. H. F. Ahmanson & Co., supra,* and ordered defendants to purchase plaintiffs' REC shares at prices that reflected their values on December 11, 1981, the date when defendants sold their shares.

■ Our finding that defendants breached their fiduciary

---

[33] *Former* ORS 57.595(1) (*repealed by* Or Laws 1987, ch 52, § 181) provided in part:

"The circuit courts shall have full power to liquidate the assets and business of a corporation:

"(a)  In an action by a shareholder when it is established:

"* * * * *

"(B)  That the acts of the directors or those in control of the corporation are illegal, oppressive or fraudulent * * *."

In almost all circumstances, a majority shareholder's breach of its fiduciary duties to the minority in a close corporation will constitute "oppressive" conduct under this statute. *See Baker v. Commercial Body Builders, supra,* 264 Or at 629.

duties is, in these circumstances, also a finding that they engaged in oppressive conduct toward plaintiffs that would justify dissolution under ORS 57.595(1)(a)(B). However, we agree with the trial court that the proper result in this case is to effect a complete separation of the parties, which a dissolution accompanied by the distribution of the REC assets to the shareholders in proportion to their interests would not achieve. A court does not need to order a dissolution after finding statutory oppressive conduct; it has broad equitable authority in deciding on the remedy. *See Baker v. Commercial Body Builders, supra,* 264 Or at 631-633. As did the trial court, we will order a purchase. However, because the legal foundation for our decision is different from the trial court's, and because the record at present does not allow us to determine all of the issues that our approach raises, we must remand the case to the trial court.[34]

Defendants' primary breach of duty was their failure to negotiate for increased rents in return for the consents. The nature of the remedy follows from the nature of the breach. The RECs were damaged to the extent that they would have obtained increased rents from New Properties if defendants had acted properly. That damage began on December 11, 1981, and will continue until the various leases expire. The damage consists of the amounts that the RECs would have received from the increased rents, plus whatever they would have earned on that money. Because defendants did not even attempt to negotiate for higher rents, determining the extent of the damage on remand may involve some speculation about what they could have achieved. Defendants cannot complain about some speculation; they could have avoided the problem if they had fulfilled their duty to plaintiffs. *See Wyss v. Inskeep,* 73 Or App 661, 669-670, 699 P2d 1161, *rev den* 300 Or 64 (1985). It should be possible to develop enough evidence, however, for the trial court to reach its decision. The record presently gives some indications of the extent of the RECs' damages. However, because the trial court's approach led the

---

[34] The theory that the trial court adopted in ordering the sale dictated the nature of the evidence of the value of the RECs that the parties thereafter introduced. For that reason, the record is presently inadequate to determine the value of the RECs under the approach that we have adopted. A remand is necessary for the parties to develop that evidence, as well as to determine the maximum that defendants could have gained for the RECs if they had fulfilled their fiduciary duties.

parties to focus on issues other than those that we have defined, the record is inadequate for a conclusive determination.

The RECs had a strong basis for asserting a right to deny consent for those leases that did not contain reasonableness clauses, and they would have obtained a significant portion of the upcharge in return for consenting to the assignment of those leases. Their right to deny consent for the leases with reasonableness clauses was weaker, but they still had a negotiating position. Bankers Life, which had a due on sale clause in its mortgages, did negotiate for concessions and ultimately settled for an increase in interest of one percent, which represented $90,000 per year in additional payments. Other lenders also received concessions. However, none of the lenders knew about the $4,000,000 provision, and defendants had no duty to protect the lenders' interests. For those reasons the RECs should have been able to do considerably better than did the independent lenders and landlords. On the other hand, it was not in the RECs' interests to press so hard that New Properties would terminate the leases rather than accept the assignments. Defendant Roberts testified that KKR would not have completed the buyout if it had been necessary to use the full $4,000,000, and we find that that testimony is correct. On the basis of the entire record, however, we think that KKR would have been willing to use a large amount of the $4,000,000 in order to keep the deal intact. KKR put the $4,000,000 provision in the financing documents in order to give itself leeway necessary to keep the buyout from failing, and it is reasonable to assume that it would have used the money for its intended purpose.

Unless the evidence on remand clearly shows that a different approach is preferable, the trial court should determine, first, the maximum percentages of the upcharge that the RECs could have received for each class of leases. It should then determine the maximum amount of the $4,000,000 fund that KKR would have used, keeping in mind the $500,000 that it had committed to other landlords and lenders. The RECs are entitled to those maximum percentages, so long as the total amount does not, in any one year, exceed the maximum available portion of the $4,000,000 fund. Defendants would not have violated Old FMI's obligation to use its best efforts to obtain the consents by obtaining them in return for those

concessions, and they would have fulfilled their duties to the RECs by doing so.

The RECs, of course, did not actually receive any portion of the upcharge and, because defendants will purchase plaintiffs' shares, it is unlikely that they ever will. However, the price that the trial court will establish on remand for plaintiffs' shares will be based on the value of the RECs with the maximum proportion of the upcharge that defendants could have negotiated taken into account. The trial court also made findings on a number of other issues (the minor claims), but it did not use those findings in determining the value of the RECs. It granted relief that was direct in form to plaintiffs on those claims that related to occurrences before December 11, 1981, the date of the buyout and the date that it established for determining the value of the RECs for the purposes of the sale. It dismissed the minor claims that related to events that occurred after that date with prejudice. We agree with the trial court's findings on both categories of minor claims, but we do not agree with its treatment of those claims that relate to events occurring after December 11, 1981.

The trial court set the date of sale because of the theory on which it ordered the sale. Because we base the sale on a finding of oppressive conduct, the trial court's choice of date is no longer appropriate. The RECs have continued to be profitable and have received benefits as the result of this case. Plaintiffs still own their shares and, in these circumstances, are entitled to have them valued as of the date of the actual sale, not of a presumed sale a number of years earlier. We therefore set the date of the judgment on remand as the date of the sale. As a result, the trial court will take its findings on the post-December 11, 1981, minor claims into consideration in establishing the price that defendants will pay for the shares.

In order to set the price for plaintiffs' shares in the RECs, the trial court will first determine the value of each REC, by a method consistent with the method that it originally used, as of the date on which it intends to enter the judgment on remand. It will then add to that value the appropriate portions of the upcharge for each year from December 11, 1981, to the date of the judgment on remand, adjusting for additional taxes that the REC would have paid on that additional income, assuming that it had had competent tax advice.

The court may first calculate that amount for the balance of 1981 and then use a calendar year basis thereafter, or it may use some other appropriate method. The upcharge on each lease will continue for the life of the lease, including any option periods. If the total upcharge for all of the RECs in any one year is more than the maximum that the court established, it will reduce the amount for each company for that year in equal proportions so that the total does not exceed that amount.

The trial court will then determine the interest, at the legal rate, that each REC would have received each year on the upcharge for that and previous years, again adjusting for the taxes that the REC would have paid on that interest. It will then add any amounts from the minor claims relating to occurrences after December 11, 1981, again making appropriate interest and tax adjustments. Finally, the trial court will capitalize the upcharge that each REC would receive after the date of the judgment on remand, adjusting the amount so that it will not exceed the yearly maximum.

The total of actual value as of the date of the judgment on remand, adjusted prejudgment upcharge, prejudgment interest on the upcharge, adjustments for the minor claims and capitalized post-judgment upcharge is the total value of each REC for the purpose of setting the price that defendants must pay. Defendants shall purchase plaintiffs' shares in each REC for the proportion of the total value, so defined, of that REC that plaintiffs' shares bear to the total shares of that REC.[35]

■   We agree with the trial court's refusal to adjust the purchase price to reflect minority or marketability discounts. This is not a sale by a willing seller to a willing buyer, and defendants should not benefit from reductions in value that are based on such a sale. We require defendants to purchase plaintiffs' interests because of their breach of duty to plaintiffs. The purchase is a judicial remedy to compensate plaintiffs for the damage resulting from defendants' wrongs, not a market transaction. *Cf. Columbia Management Co. v. Wyss,* 94

---

[35] Because the effective date for determining the purchase price will be the date of the judgment on remand, we need not decide the method of computing prejudgment interest on the value of the shares or some of the other issues on the appeal and the cross-appeal.

Or App 195, 765 P2d 207 (1988) (applying a marketability discount to a sale of shares under *former* ORS 57.865 to ORS 57.890 when there was no evidence of misconduct by the company). In addition, applying those discounts would give plaintiffs less than they would receive on a dissolution after defendants had made the RECs whole for the damage they suffered, a result that would not be appropriate in light of our finding of defendants' oppressive conduct.

■   Plaintiffs assign error to the trial court's refusal to award punitive damages. Although we have found that defendants violated their duties to plaintiffs in ways additional to those that the trial court found, we do not, on *de novo* review, believe that their actions were sufficiently egregious to require judicial punishment. The long-standing subordination of the RECs' interests to those of Old FMI, and Chiles' almost equally long acquiescence in that relationship, contributed to defendants' insensitivity to their fiduciary duties to Chiles and the RECs. Defendants did not wilfully harm Chiles but only failed to fulfill their duties to him. Punitive damages would not serve any useful purpose.

■   There are several issues regarding attorney fees. The first relates to plaintiffs' third claim, in which they sought a ruling that the RECs were not bound by a constructive trust to hold their properties for the benefit of Old FMI or its successors. The trial court granted the requested relief to the RECs derivatively and held that plaintiffs were entitled to attorney fees for having produced this benefit to the corporations. *See Krause v. Mason,* 272 Or 351, 358-359, 537 P2d 105 (1975). Rather than file an immediate request for a specific fee award, plaintiffs moved that the court defer ruling until after all appellate issues were resolved. The court entered an order in accordance with plaintiffs' wishes. By so doing, plaintiffs effectively waived their right to attorney fees on this claim.

ORCP 68C(4)(a)(i) provides for the award of costs and disbursements and attorney fees as part of the judgment *if* the party seeking them serves a statement of the amount "not later than 10 days after the entry of the judgment * * *." The other parties then have 15 days to file objections, and the court will hold a hearing to decide the issue. ORCP 68C(4)(b); ORCP 68C(4)(c). If the case was appealed before the court's ruling, an aggrieved party may then include the attorney fees

issue in the original appeal in accordance with the Rules of Appellate Procedure. ORS 19.033(1); ORAP 2.07. The time periods in the rules are specific and are designed to provide a rapid resolution to costs and attorney fees disputes. Even if a trial court has inherent authority to extend the times, in this case it did so in a way that by its terms made unified appellate review of the entire case an impossibility. The statute does not contemplate the piecemeal appeals that the trial court's action would produce. Plaintiffs will not be entitled on remand to an attorney fee award related to their third claim for relief.

■  Plaintiffs assign error to the trial court's failure to grant them attorney fees for the various minor claims on which the court found in their favor. The court ordered defendants to pay plaintiffs the amounts that the individual RECs should have received on those claims, in proportion to plaintiffs' ownership interests in each REC. Defendants argue that that was a direct rather than a derivative recovery. We disagree. Because the trial court ordered defendants to purchase plaintiffs' shares, there was no purpose in ordering payment of these claims to the RECs directly; defendants could have repaid themselves as soon as the sale was complete. The direct payments to plaintiffs were, in essence, simply increases in the purchase price. Plaintiffs are entitled on remand to their attorney fees on the minor claims, including the post-December 11, 1981, claims that the court will consider in setting the amount that defendants must pay for the REC shares.[36]

## FRED MEYER, INC. v. SOUTHEAST COMPANY

The remaining issues relate to the trial court's rulings in this case, in which it enjoined Southeast Company, a Chiles-controlled REC, from terminating or attempting to terminate the lease of its store to Old FMI on the ground that the assignment to New Properties and sublease to New FMI, to which the company did not consent, violated the lease. The court held that it was not commercially reasonable for the

---

[36] We reject defendants' argument that some of the minor claims are barred by the Statute of Limitations. Because defendants do not assign error to the trial court's decision that the SLC did not satisfy the legal criteria for disinterestedness, the SLC's recommendation that the RECs not pursue certain of the minor claims has no significance on appeal.

company to refuse consent and that the reasonableness clause in the lease therefore required it to consent.

We hold above that there was a legitimate argument that it was commercially reasonable for the RECs that are defendants in *Chiles v. Robertson* to refuse consent. The issue now is different; it is not whether one could *argue* that refusal was reasonable but whether refusal by *this* REC was, in fact, reasonable.[37] Although plaintiffs[38] emphasize defendant Robertson's status as both chairman of Old FMI and a director of Southeast Company, there are no significant fiduciary duty issues. Robertson could not control the company's response to the request for its consent, nor could he establish its negotiating position or strategy. More significantly, there is no indication that he participated in those matters in any respect. Nothing that he did or failed to do as a Southeast Company director affected the company's situation.[39]

■ Because the use of the stores would be unchanged after the assignments, the most significant factor affecting commercial reasonableness was whether payment of the lease rentals would be secure. Although the structure of the buyout increased New Properties' and New FMI's debt considerably above Old FMI's, their combined cash flow was projected to remain strong.[40] The financing of the buyout contemplated that New Properties would pay out its net worth by 1996 and would then be dissolved, before the Southeast Company lease and its options would expire. However, New FMI guaranteed New Properties' obligations, and it should have been able to

---

[37] We need not discuss most of the other issues that plaintiffs raise with regard to this case.

[38] We continue to refer to the parties by their designations in *Chiles v. Robertson*. *See* note 3, *supra*.

[39] Robertson did not tell the Southeast Company board of the $4,000,000 provision. That failure may have been a breach of his duty as a director of the company and probably reflected his view that he was a representative of Old FMI's interests rather than having independent duties to Southeast Company. However, it appears that knowledge of that provision before the buyout would not have affected plaintiffs' course of action, because of their belief that Old FMI's fiduciary duties required it to share the upcharge with them proportionately; plaintiffs at that time, during the trial, and on appeal have carefully avoided analyzing their rights as a matter of real estate law.

[40] We do not consider the evidence that defendants produced at trial, and on which they rely on appeal, of New FMI's experience since the buyout. The reasonableness of the consent must be judged as of the time that the consent was requested.

continue to pay the relatively low rents if New Properties proved unable to do so before its dissolution as well as after the dissolution. The new entities were not as strong financially as was Old FMI, but they were still strong enough to meet their obligations to the company. The buyout did not increase Southeast Company's risks significantly, and there was therefore no financial basis for it to refuse consent.

The one issue that gives us some concern is the threat of "tainted rent" under the personal holding company provisions of the Internal Revenue Code. *See* IRC §§ 541-547. Because New Properties would own more than 25 percent of Southeast Company, there would be a personal holding company problem for it as well as for the RECs that Old FMI controlled. It was possible to arrange the company's finances to avoid the personal holding company tax itself, but doing so could affect the company's overall profits. However, almost all of the evidence on this point related to the RECs that Old FMI controlled. Plaintiffs have not shown that the personal holding company problem would have had a serious impact on Southeast Company, and we are therefore unable to consider it in determining the commercial reasonableness of refusing consent. We therefore find that refusing consent as to the Southeast store was not within the range of commercial reasonableness and affirm the trial court's judgment in this case.

On appeal of Circuit Court case No. A8309-05871, paragraphs 1 and 2 of the judgment vacated, paragraph 5 reversed and otherwise affirmed; on cross-appeal, paragraph 6 of judgment reversed to the extent that it contemplates award of attorney fees related to plaintiffs' third claim for relief and otherwise affirmed; remanded for further proceedings not inconsistent with this opinion. Affirmed on appeal and cross-appeal in Circuit Court case No. 8411-06749.