958 F.2d 376
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Ben BLEICH, Jay Bleich, Jo Ann Bleich, William B. Borgeson,
Kent E. Clark, Robert J. Friedsam, Shirley Harris, Robert B.
Ironside, M.D., Marrion McCown, John P. Nelson, Edgar T.
Numrich, Ormal and Lona Peer, Jack T. Rainey, Margaret
Rainey, Redland Insurance Company, Clark Sampson, Deborah K.
Smith, W. Boyd Smith, Mrs. W. Boyd Smith, Tree Products
Enterprises, Inc., Craig Vallely, Kelly Waller, John Warta,
Wendell Webb, and Robert and Cleo Angell, Plaintiffs-Appellants,
v.
AMERICAN NETWORK, INC., CP National Corporation, E.B.
Galligan, John H. Geiger, A.M. Gleason, Pacific
Telecom, Inc., and Price Waterhouse,
Defendants-Appellees.
 No. 90-35675.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Jan. 6, 1992.
Decided March 23, 1992.
 
 1
 Before JAMES R. BROWNING, D.W. NELSON and CANBY Circuit Judges.
 
 
 2
 MEMORANDUM*
 
 
 3
 Between 1983 and 1988, American Network, Inc. ("AmNet"), a publicly traded corporation, engaged in a number of transactions, including mergers, acquisitions and investments. Appellants, minority shareholders of AmNet, claim that these transactions violated federal and state securities laws. Those claims, along with a breach of contract claim, were dismissed on summary judgment. Appellants appeal from the grant of summary judgment, and from the dismissal of their breach of fiduciary duty claim and the denial of leave to amend their complaint. We affirm the decision of the district court.
 
 DISCUSSION
 
 4
 I. Breach of Fiduciary Duty.
 
 
 5
 In their first two complaints, appellants alleged intentional breach of fiduciary duty. The district court dismissed this allegation pursuant to Fed.R.Civ.P. 12(b)(6), concluding that appellants' breach of fiduciary duty claim was derivative in nature and that appellants had no standing to bring a direct action because AmNet had been sold and appellants no longer owned stock at the time they brought the suit.[1] Appellants claim that because they are barred from bringing a derivative suit, they should be allowed to maintain a direct action for common law breach of fiduciary duty. The district court's dismissal for failure to state a claim under Fed.R.Civ.P. 12(b)(6) is reviewed de novo. Sax v. Worldwide Press, 809 F.2d 610, 613 (9th Cir.1987).
 
 
 6
 The general rule is that a "stockholder of a corporation has no personal right of action against directors or officers who have defrauded or mismanaged it and thus affected the value of his stock. The wrong is against the corporation and the cause of action belongs to it." Smith v. Bramwell, 31 P.2d 647, 648 (Or.1934). Appellants contend that this rule has been eroded by Chiles v. Robertson, 767 P.2d 903 (Or.App.); modified on reconsideration, 774 P.2d 500 (Or.App.); review denied, 784 P.2d 1099 (Or.1989). The plaintiffs in Chiles were minority shareholders in a close corporation who sued both directly and derivatively for breach of fiduciary duty. The Chiles court only considered the direct claims and held that the defendants had breached their fiduciary duty and ordered the defendants to purchase plaintiffs' shares. Chiles, 767 P.2d at 923-924. The Chiles court stated that because the remedies available in the direct action were equitable as to the issues in question, it would not consider the derivative claims. Chiles, 767 P.2d at 922 n. 30.
 
 
 7
 Appellants argue that the result in Chiles extends to publicly held corporations because the Chiles court based its decision upon Jones v. H.F. Ahmanson, 460 P.2d 464 (Cal.1969) and Weinberger v. UOP, Inc., 457 A.2d 701 (Del.1983), both of which involved publicly traded corporations. Although the Chiles court did rely on Ahmanson and Weinberger, it did not do so for the proposition appellants are asserting, namely that its opinion can be extended to publicly traded corporations. Ahmanson was cited as an example of how dominating shareholders can breach their duty to the minority while Weinberger was cited for its definition of the concept of fairness between majority and minority shareholders. Chiles, 767 P.2d at 914, 915.
 
 
 8
 Nothing in Chiles suggests that the court intended its result to apply to publicly traded corporations. Although Chiles does not expressly limit itself to close corporations, this result is apparent from the remedy. If the court allowed recovery on the derivative claims, any damages recovered would go directly to the corporation. See Smith v. Bramwell, 31 P.2d at 648. The minority shareholders would still own stock in a corporation controlled by the oppressive majority. Since there is no public market for shares of a close corporation, the only remedy available to relieve the minority from oppression would be to require the majority to purchase their shares. Minority shareholders in a publicly traded corporation, by contrast, can sell their shares at any time. It appears that the Chiles court decided the case on the direct actions because only then could minority shareholders in a close corporation be adequately compensated and be free from the oppressive majority.[2]
 
 
 9
 In addition, appellants attempt to characterize their allegations as direct rather than derivative by asserting that they have suffered individual harms. An action is considered derivative "if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock or property without any severance or distribution among individual holders." 12B W. Fletcher, Cyclopedia of the Law of Private Corporations § 5911 (footnotes omitted). Each of the alleged instances of individual harm listed in appellants' amended complaint are examples of derivative claims because they would affect all shareholders equally. Waste and mismanagement of corporate assets, issuing stock for inadequate consideration, depreciation in the value of the stock and violation of federal securities laws are all examples of derivative claims because they affect the entire corporation, not just a few shareholders. See id. at §§ 5913, 5923, 5923.2. In fact, in p 172(b) of appellants' amended complaint, appellants admit that the shares of all stockholders would be diluted, not just their own shares. Appellants argue that this court should recognize that minority shareholders have individual rights when they purchase stock in a corporation which was "looted by its majority shareholders." In essence, this is an allegation of diminution in the value of their shares due to corporate mismanagement and is thus a derivative claim. The district court properly dismissed appellants' claim.
 
 
 10
 II. Summary Judgment.
 
 
 11
 Summary judgment is reviewed de novo. The evidence is reviewed in the light most favorable to the nonmoving party to determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Tzung v. State Farm Fire and Casualty Co., 873 F.2d 1338, 1339-40 (9th Cir.1989). If the nonmoving party's evidence is not sufficiently probative, summary judgment may be granted. In re Apple Computer Securities Litigation, 886 F.2d 1109, 1113 (9th Cir.1989) (citations omitted), cert. denied, 110 S.Ct. 3229 (1990).
 
 
 12
 A. p 122(a)--The Misstated Value Allegation.
 
 
 13
 Appellants claim that appellees made misstatements regarding the value of the merger between AmNet, SaveNet and CP National Corp. ("CPN"). The district court concluded that appellants were contending that appellees understated the value of the purchase. The district court held that, assuming this was true, "[a]nyone who might purchase in reliance on an understatement would gain by the increase worth to real value rather than lose.... Thus, understatement is not a fact the reasonable investor would consider in making an investment decision." Appellants argue on appeal that this allegation has been mischaracterized by the appellees and the district court. Appellants assert that the allegation should now be read as claiming that the true value of AmNet's purchase of CPN's Passport and Command Central divisions deal was misstated rather than understated.
 
 
 14
 Appellants claim that starting with the November 29, 1984 proxy statement, appellees made misstatements regarding the value of the AmNet shares given to CPN.[3] Appellants claim that the purchase of the two CPNNS divisions should have been disclosed separately because the Passport division was acquired with AmNet stock valued at $1 per share and the Command Central division was acquired with AmNet stock valued at market price, more than $4 per share.
 
 
 15
 Appellants' argument is without merit. The fact that AmNet received $3,586,328 worth of assets from CPN for CPNNS in exchange for 3,586,328 shares of AmNet stock valued at $1 per share was disclosed in AmNet's February 24, 1985 S-14. In order for appellants to recover they must prove "both transaction causation, that the violations in question caused the plaintiff to engage in the transaction, and loss causation, that the misrepresentations or omissions caused the harm." Hatrock v. Edward D. Jones & Co., 750 F.2d 767, 773 (9th Cir.1984). See also Schlick v. Penn-Dixie Cement Corp., 507 F.2d 374, 380 (2nd Cir.1974) ("a plaintiff must demonstrate that he relied on the misrepresentations in question when he entered into the transaction which caused him harm"), cert. denied, 421 U.S. 976 (1975).
 
 
 16
 According to the Supplemental Affidavit of Edgar T. Numrich in Support of Plaintiffs' Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment, dated June 25, 1990, none of the appellants purchased any stock between the time the proxy statement was issued in November 1984 and full disclosure in February 1985. Appellants cannot prove that the alleged misrepresentations caused them to purchase stock because they did not purchase any during the time it is alleged that misrepresentations remained uncorrected. The district court was correct in granting appellees summary judgment on this issue.
 
 
 17
 B. p 122(b)--The Going Concern Allegation.
 
 
 18
 Appellants allege that Price Waterhouse withheld a going concern qualification only because Pacific Telecom, Inc. ("PTI") was committed to financially support AmNet for one year. The district court concluded that Price Waterhouse relied upon a number of factors, not just PTI's promised support, in deciding that a going concern allegation was not necessary for AmNet's 1983 financial statements. Appellants maintain that the district court and appellees have mischaracterized this allegation by failing to consider whether any of Price Waterhouse's reasons for not including a going concern qualification were proper.
 
 
 19
 Appellants contend that according to their expert, Dr. Buckley, a going concern qualification was required before the AmNet-CPN-SaveNet mergers and even after the mergers took place. Appellants cite no evidence for this proposition and none can be found within Dr. Buckley's affidavit. In his affidavit, Dr. Buckley concluded that a going concern qualification should have been included in AmNet's 1983 financial statements because without the SaveNet and CPN mergers, AmNet would have gone under. There is no mention of including a going concern qualification in financial statements for the years after 1983. In addition, appellants allege that the assertions of the Price Waterhouse partner in charge, Mr. Irving, and the documents referred to by the district court are "simply unbelievable." Appellants cite no evidence to support this proposition.
 
 
 20
 According to the Affidavit of Donald Irving, dated April 27, 1990, Price Waterhouse indicated in its working papers that it considered whether a going concern qualification was necessary. During its investigation Price Waterhouse interviewed several corporate executives and reviewed financial documents. After listing all the reasons why it thought a going concern qualification might be necessary, Price Waterhouse then listed all the reasons why one was not necessary. In the December 31, 1983 prospectus and in the 10-K's for 1984 and 1985, Price Waterhouse stated that it had considered whether a going concern qualification was necessary. In all three documents, Price Waterhouse supplied evidence why it concluded that a going concern qualification was not necessary. Appellants have not cited any evidence to prove that Price Waterhouse's actions were insufficient. The district court correctly concluded that appellants' allegation was not supported by the record.
 
 
 21
 C. p 122(f)--The Interested and Related Parties Allegation.
 
 
 22
 Appellants agree with the district court that the complex relationships among AmNet, PTI, SaveNet and CPN were disclosed, but they allege that these disclosures were not complete or truthful. Appellants now claim that the following should have been disclosed: 1) the method used to value the AmNet shares purchased by PTI; 2) the "sweetheart deal" with CPN; 3) the fact that CPN's assets were worthless; 4) details of the equipment leasing program; and 5) that the real reason why PTI and CPN became involved in AmNet was to insulate themselves from competition.[4]
 
 
 23
 Appellants assert that these omissions were violations of section 10(b) and section 18 of the Securities and Exchange Act of 1934. In order for appellees to be liable under 10b-5 for material omissions or misstatements, appellants must prove that the misrepresentations or omissions were of material facts. Basic v. Levinson, 485 U.S. 224, 231-232 (1988). The same is true for liability under section 18. Pearlstein v. Justice Mortgage Investors, Fed.Sec.L.Rep. (CCH) p 96,760 at 94,975 (N.D.Tex.1978); see also Kennedy v. Chomerics, Inc., 669 F.Supp. 1157, 1163-64 (D.Mass.1987); Beebe v. Pacific Realty Trust, 578 F.Supp. 1128, 1151-52 (D.Ore.1984). Information is deemed to be material if "there is a substantial likelihood that a reasonable shareholder would consider it important." Similarly, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Basic, 485 U.S. at 231-32 (citations omitted).
 
 
 24
 The facts that PTI was purchasing AmNet convertible preferred stock at $1 per share and that PTI had warrants to purchase stock at 1cents and $1.10 were disclosed repeatedly.[5] Appellants give no reasons why the method of valuation must be disclosed. A reasonable investor would consider the existence of the warrants to be important because they directly affect the proportion of the investor's ownership in a company. However, the method of valuation would not change an investor's mind on whether to purchase or sell stock.
 
 
 25
 The other alleged misstatements or omissions are easily disposed of. Appellants cite no evidence for the proposition that CPN's assets were worthless. In fact, the 1984 10-K, indicates that in exchange for $3.5 million in AmNet stock, AmNet obtained $2 million in cash, 5,000 new customers and two companies which registered a gross profit of over $2.3 million in 1984 from CPN. The equipment leasing transaction with a PTI subsidiary was adequately disclosed.[6] Appellants do not give any indication what "details" of the leasing transactions have not been disclosed. Nondisclosure of the "sweetheart deal" with CPN is discussed in section II.A. supra, and nondisclosure of the hidden motive is discussed in section II.D. infra. The district court correctly concluded that the relationships between the parties were fully disclosed.
 
 
 26
 D. p 122(g)--The Anti-Competitive Motive Allegation.
 
 
 27
 Appellants allege that appellees failed to disclose that the purpose behind the AmNet-CPN-SaveNet merger was to prevent competition with Alascom, Inc., a PTI subsidiary. The district court held that this allegation did not constitute securities fraud according to Panter v. Marshall Field & Co., 646 F.2d 271 (7th Cir.), cert. denied, 454 U.S. 1092 (1981).
 
 
 28
 Since a shareholder cannot recover under 10b-5 for a breach of fiduciary duty, neither can he 'bootstrap' such a claim into a federal securities action by alleging that the disclosure philosophy of the statute obligates defendants to reveal either the culpability of their activities, or their impure motive for entering the allegedly improper transaction.
 
 
 29
 Id. at 288.
 
 
 30
 Appellants do not dispute the district court's view of the law. However, appellants contend that not only were they alleging improper motives, but they were also alleging that appellees concealed their improper motives by distorting the facts. Appellants claim that under Panter hidden motives are actionable if the "conduct complained of includes the omission or misrepresentation of a material fact." Panter, 646 F.2d at 288. Yet to support this claim, appellants allege that appellees' anti-competitive motives "lead (sic) directly to a series of transactions that were not in the best interest of AmNet." This is an allegation that the appellees breached their fiduciary duty to act in the best interest of AmNet. It is not an allegation that there were omissions or misrepresentations of material fact. If "the central thrust of a claim ... arises from acts of corporate mismanagement, the claims are not cognizable under federal law." Panter 646 F.2d at 289 (citing Hundahl v. United Benefit Life Insurance Co., 465 F.Supp 1349 (N.D.Tex.1979)). Appellants have stated only a claim that appellees did not manage AmNet properly; therefore, the district court properly granted summary judgment on the federal securities claim.
 
 
 31
 E. p 129(a)-(d)--Galligan's alleged oral misrepresentations?
 
 
 32
 1. Summary Judgment for Galligan.
 
 
 33
 Appellants allege that appellee Galligan made four statements regarding the SaveNet merger which he knew were false and which were made to artificially inflate the price of AmNet stock. The district court held that Galligan "did reasonably believe that the transaction being negotiated would have a positive effect on Amnet stock and that he was unaware of any undisclosed facts which would tend to undermine this belief."
 
 
 34
 Appellants claim that there was no way Galligan could have believed his statements because he was involved in the StarNet negotiations and therefore must have known his statements were false. In support of this allegation, appellants claim that Galligan knew: 1) that StarNet was losing millions of dollars; 2) that StarNet was using inferior technology; 3) that the merger was contrary to a consultant's opinion that AmNet should remain a regional carrier; and 4) that Galligan's motive in securing the StarNet merger was to obtain employment with Ford Aerospace.
 
 
 35
 A statement of belief contains three implicit factual assertions: "(1) that the statement is genuinely believed, (2) that there is a reasonable basis for that belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement." In re Apple Computer Securities Litigation, 886 F.2d 1109, 1113 (9th Cir.1989), cert. denied, 110 S.Ct. 3229 (1990).
 
 
 36
 Appellants rely upon the testimony of John Warta to prove that Galligan could not have believed his statements. However, Warta's testimony only proves that Warta could not believe Galligan wanted to buy StarNet because it was losing millions of dollars. Warta's opinion of the merger has no bearing on what Galligan believed or knew. Warta also testified that Galligan said he wanted to acquire StarNet in order to dilute PTI's control of AmNet and to get a job at Ford Aerospace. This may have been Galligan's "motive" behind the purchase of StarNet, but it is not evidence that he knew the StarNet deal was not in AmNet's best interest. In addition, Warta testified that AmNet's consultant believed AmNet should become a regional carrier and that they disagreed with Galligan because he believed AmNet should not own its facilities. Again, this testimony does not prove that Galligan did not believe the StarNet deal would be good for AmNet. Appellants cite to Warta's testimony about StarNet's brochure which stated that it wanted to get out of satellites and into fiber optics as evidence that StarNet was using inferior technology. This is evidence that Galligan knew StarNet was using satellite technology. This is not evidence that Galligan could not have reasonably believed that the StarNet deal would benefit AmNet.
 
 
 37
 Finally, appellants allege that AmNet's 1986 10-K indicates that the StarNet deal caused AmNet to "hemorrhage" $7.5 million per quarter and this is proof Galligan knew his statements were false. There is no evidence in the 1986 10-K that AmNet was losing so much money. In fact, AmNet showed a net income for the first time. In its 1987 10-K, AmNet stated that it lost $26 million in 1987, partially as a result of increased costs due to the StarNet merger. This alone is not sufficient proof that Galligan knew in 1986 that the StarNet deal would turn out badly for AmNet. Without any evidence to raise an issue of triable fact as to whether Galligan's belief was not reasonable or genuine or that he knew of facts which undermined the accuracy of his statements, the district court correctly granted summary judgment on this issue.
 
 
 38
 2. Summary judgment for other defendants.
 
 
 39
 In their complaint, appellants claim that the other appellees were liable for Galligan's misrepresentations as control persons, in violation of federal and Oregon law. The district court granted summary judgment on this issue for all other appellees because there was no evidence of their involvement in Galligan's alleged misrepresentations.
 
 
 40
 As a preliminary requirement for control person liability, there must be primary liability on the part of the controlled person. Section 20(a) of the Securities Exchange Act provides that: "[E]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person ..." 15 U.S.C. § 78t(a) (emphasis added).
 
 
 41
 Similarly, under Or.Rev.Stat. § 59.115(3), "[e]very person who directly or indirectly controls a seller liable under subsection (1) of this section ... and every person who participates or materially aids in the sale is also liable jointly and severally with and to the same extent as the seller ..." (emphasis added). This statute is based substantially on section 20(a) of the Securities Exchange Act of 1934. See Badger v. Paulson Investment Co., Inc., 803 P.2d 1178, 1182 (Or.1991).
 
 
 42
 Since Galligan did not make false or misleading misrepresentations, there is no basis for finding any other appellees liable as control persons.[7]
 
 
 43
 F. pp 187-192, AmNet's Alleged Breach of Numrich's Contract.
 
 
 44
 Appellant Numrich was the sole owner of Torrey & Co. ("Torrey"), an investment brokerage business. Numrich claims that according to a contract with AmNet, Torrey was to be paid a commission based on the amount of PTI's investment in AmNet. Numrich claims AmNet breached this contract by not paying his fee. The district court concluded that based upon an agreement signed by Numrich on January 27, 1984, Torrey was not entitled to any fee.
 
 
 45
 The January 27, 1984 agreement states that when the investment in AmNet by PTI closes, "no finder's or broker's fees are owed by any party to any other party in respect of the PTI Investment." Numrich alleges that he was coerced into signing the waiver by threats of never working for AmNet or PTI again and because he feared that if he didn't, PTI would cancel its planned investment and AmNet shareholders would lose everything. A copy of the initial underwriting agreement was not included in the record, nor did Numrich cite any specific instances of coercion.
 
 
 46
 Under Oregon law, there are three elements of economic duress: "1) wrongful acts or threats; 2) financial distress caused by the wrongful acts or threats; and 3) the absence of any reasonable alternative to the terms presented by the wrongdoer." The Oregon Bank v. Nautilus Crane & Equipment Corp., 683 P.2d 95, 103 (Or.App.1983) (citations omitted). Here, as in Oregon Bank, the alleged threat was to cease doing business unless an agreement was signed. However, this is not sufficient to constitute duress. "It is well established, however, that threats to do what the threatening person had a legal right to do does not constitute duress." Id. Absent any evidence that AmNet was contractually obligated to continue to do business with Torrey after the initial underwriting, AmNet had a legal right to negotiate the terms of the new agreement and not to do business with Torrey if the fee was not waived. Numrich does not claim that there was any prior agreement between Torrey and PTI, therefore, PTI was free to do business with anyone on whatever terms it chose. Summary judgment was appropriate on this issue.
 
 
 47
 III. Third Amended Complaint.
 
 
 48
 After appellants filed their amended complaint, they were told by the district court that they would get only one more chance to amend their complaint. The district court found that appellants made new allegations regarding the AmNet-CPN transactions in response to the summary judgment motions that were not included in the second amended complaint. The district court refused to allow appellants an opportunity to amend their complaint to add those allegations. Relying upon Jackson v. Bank of Hawaii, 902 F.2d 1385 (9th Cir.1990), the district court held that appellants would be prejudiced by adding the new allegations, that appellants waited too long to amend their complaint, and that any further amendments would be futile.
 
 
 49
 Failure to allow amendment of a complaint is reviewed for an abuse of discretion. The district court's decision will not be reversed unless this court has a firm and definite conviction that the district court committed a clear error of judgment. Parker v. Joe Lujan Enterprises, Inc., 848 F.2d 118, 120 (9th Cir.1988).
 
 
 50
 Appellants allege that the district court refused to allow another amendment because it was impatient with appellants' perceived delay. Appellants then claim that undue delay alone is an insufficient ground for refusing amendments, and that bad faith or prejudice is required. See United States v. Webb, 655 F.2d 977, 990 (9th Cir.1981). Appellants claim that appellees have not shown any prejudice and another amendment should be allowed.
 
 
 51
 There are numerous reasons why the district court was justified in not allowing any further amendments. Appellants waited over 18 months before trying to amend their third complaint. Although undue delay is not sufficient reason to deny amendment on its own, it is a factor. Jackson, 902 F.2d at 1387. Appellants waited until the day before discovery closed, after 29 depositions were taken, to amend their complaint. Any further amendments would have prejudiced appellees because they would have nullified prior discovery and required further discovery. Id. Appellants also had two prior opportunities to cure their deficient allegations and they were unable to do so. Appellants were aware during summary judgment that their second amended complaint was final. The district court did not abuse its discretion in not allowing further amendments to the complaint.
 
 CONCLUSION
 
 52
 For the foregoing reasons, the district court's decision is AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 "[G]eneral principles of standing require that, in order to bring a derivative suit, a shareholder must own stock at the time of the alleged wrong and retain ownership for the duration of the litigation." Metal Tech. Corp. v. Metal Teckniques Co., Inc., 703 P.2d 237, 242 (Or.App.1985)
 
 
 [2]
 Appellants' citation to Stringer v. Car Data Systems, Inc., 816 P.2d 677 (Or.App.); modified on reconsideration 821 P.2d 418 (Or.App.1991) does not alter this result. While Stringer recognized that majority shareholders owe a fiduciary duty to minority shareholders in a close corporation, it does not hold that minority shareholders in a publicly traded corporation be allowed to bring a direct cause of action for breach of fiduciary duty
 
 
 [3]
 AmNet purchased two divisions from CPN, Passport and Command Central. These two divisions consisted of almost all of the assets of CP National Network Services, Inc. ("CPNNS"), a subsidiary of CPN
 
 
 [4]
 Appellees contend that these issues are being raised for the first time on appeal. Because this issue can be disposed of with the facts on hand, this court will address this issue even though it may have been raised for the first time on appeal. Animal Protection Institute of America v. Hodel, 860 F.2d 920, 927 (9th Cir.1988)
 
 
 [5]
 See AmNet's 1984 10-K, January 28, 1984 8-K, March 31, 1984 8-K, April 17, 1987 proxy and 1983 10-K
 
 
 [6]
 See AmNet's February 14, 1984 S-14, 1984 10-K and 1983 10-K
 
 
 [7]
 CPN filed a separate brief stating additional reasons why CPN should not be held liable for any misrepresentations, either written or spoken. Since the claims against the other defendants were properly dismissed on summary judgment, there is no need to address CPN's additional arguments